IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 03-CV-60626-MARRA/SELTZER

ESTHER YONG, individually and as personal )
representative of the estate of PETER CHOON )
MIN YONG, et al., )
                         )
             Plaintiffs )
                         )
        vs. )
                         )
EMBRAER-EMPRESA BRASILEIRA DE )
AERONAUTICA, S.A., a foreign corporation for )
profit, et al. )
               Defendants. )
------------------------------------------------------ x

## AFFIDAVIT OF STEPHEN R. STEGICH ATTACHING PLEADINGS IN SUPPORT OF DEFENDANT EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

State of New York    )
                  )    ss.
County of New York  )

I, STEPHEN R. STEGICH, hereby submit true and correct copies of documents previously filed in this litigation and upon which defendant EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A.'s relies in support of its motion to dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, *codified at* 28 U.S.C. §§1330, 1391(f), 1441(d) & 1602-11, which are:



1.     Attached hereto as Exhibit "A" is a true and correct copy of the Notice of Removal which removed the case of *Esther Yong et al. v. Embraer et al.*, Case No. 01012417-CACE-11 from the 17th Judicial Circuit, Broward County, to this Court.

2.     True and correct copies of the exhibits to the Notice of Removal are included, as follows:

   a.     Exhibit "1" to the Notice of Removal is a true and correct copy of the Complaint filed in *Yong v. Embraer*, Case No. 01012417-CACE-11 (17th Jud'l Cir. Broward County);

   b.     Exhibit "2" to the Notice of Removal is a true and correct copy of the Affidavit of Carlos Rocha Villela ("Villela Affidavit") in Support of Removal; and

   c.     Exhibit "3" to the Notice of Removal is a true and correct copy of the Consent and Joinder in Removal executed by co-defendant EMBRAER AIRCRAFT CORPORATION ("EAC").

3.     True and correct copies of the exhibits to the Villela Affidavit, Exhibit "2" above, are also included, as follows:

   a.     Exhibit "A" to the Villela Affidavit is a true and correct copy of Brazilian Decree Law No. 770;

   b.     Exhibit "B" to the Villela Affidavit is a true and correct copy of EMBRAER's Original By-laws.

   c.     Exhibit "C" to the Villela Affidavit is a true and correct copy of the Export Certificate of Airworthiness for the EMB-110 Aircraft, Serial No. 110-416.

   d.     Exhibit "D" to the Villela Affidavit is a true and correct copy of the Purchase Agreement No. 313-COI/84 between Embraer and PLM Transportation Equipment Corporation dated March 19, 1984.

   e.     Exhibit "E" to the Villela Affidavit is a true and correct copy of Certificate Data Sheet No. 7202.

4.      A true and correct copy of plaintiff's Complaint filed in *Yong et al. v. Embraer et al.*, Case No. 01-CV-3145-KING/O'SULLIVAN is attached hereto as Exhibit "B."

_____
                  STEPHEN R. STEGICH

Sworn and subscribed to before
me this 4th day of April, 2003

_____
Notary Public

ELISABEL CHANG
Notary Public, State of New York
No. 01CH5044202
Qualified in Queens County
Commission Expires May 22,

3

**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| ESTHER YONG, individually and as personal representative of the estate of PETER CHOON MIN YONG; JONATHAN CHUANG HAO YONG; individually; SAMUEL CHUANG LOONG YONG, a minor, by and through his Guardian ad Litem, ESTHER YONG, all surviving heirs of PETER CHOON MIN YONG, deceased, | ) ) ) ) ) ) ) ) ) | **Civil Action No.** |
| | ) | |
| Plaintiffs, | ) ) | **NOTICE OF REMOVAL** |
| vs. | ) ) | |
| EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A., a foreign corporation for profit; EMBRAER AIRCRAFT CORPORATION, a Florida subsidiary of EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| ------------------------------------------------- | X | |

1.      This action was commenced as Case No. 01-01-2417-CACE-11 in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.  A copy of the Complaint is annexed hereto as Exhibit "1."

2.      The Complaint alleges that, on July 24, 1999, Plaintiffs' Decedent was a passenger on an EMB-110-P1 "Bandeirante" model aircraft, Fiji Reg. No. DQ-AFN (the "Aircraft"), operated as Air Fiji Flight 121 from Nausori, Fiji, to Nadi, Fiji.  The Aircraft was designed by defendant EMBRAER prior to 1978, manufactured by EMBRAER in 1982-83,

and sold by EMBRAER to its first buyer in 1984. See Affidavit of Carlos Rocha Villela ("Villela Aff."), Exhibit "2" hereto, ¶10.

3.     Removal is proper under 28 U.S.C. § 1441(d) because EMBRAER is a "foreign state as defined in section 1603(a) of this title [i.e., 28 U.S.C. §1603(a)]." A "foreign state" under 28 U.S.C. § 1603(a) includes a foreign state's "agencies or instrumentalities" as defined in 28 U.S.C. §1603(b).    According to 28 U.S.C. § 1603(b), an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b) must be: (1) a separate legal person, corporate or otherwise; (2) majority-owned by a foreign state or political subdivision thereof; and (3) not incorporated under the laws of any of the states of the United States or any third country. Under existing law, the relevant time for determining FSIA applicability is the time the alleged wrongful conduct occurred, which, in product liability actions against "foreign state" manufacturers, is the time the product was designed, manufactured, and sold. See In re Aircrash Disaster near Monroe, Michigan, 987 F. Supp. 975, 978 (E.D. Mich. 1997); but see Dole Food Co. v. Patrickson, 122 S. Ct. 2657 (2002) & Dead Sea Bromine Co. v. Patrickson, 122 S. Ct. 2658 (2002) (granting certiorari on issue of time for determining FSIA applicability).

4.     EMBRAER meets these criteria. At all relevant times it was a separate legal person, majority-owned by the Government of Brazil, and not incorporated under the laws of any of the United States or any country other than Brazil. See Villela Aff., Exh. 2 hereto, ¶¶3-7 & 11; Decree Law No. 770, Arts. 4 & 5, attached as Exhibit "A" to Villela Aff. and EMBRAER's Original By-laws, attached as Exhibit "B" to the Villela Aff.

5.      EMBRAER obtained certification for the design of the EMB-110 model aircraft from the Centro Técnico Aeroespacial ("CTA"), the Brazilian equivalent of the Federal Aviation Administration, prior to 1978.  See Villela Aff., Exhibit "2" hereto, ¶10; Certificate Data Sheet No. 7202, Exhibit "E" to Villela Aff.  EMBRAER manufactured the Aircraft involved in the Air Fiji accident in 1982-83, and delivered it to its first buyer in 1984. See Villela Aff., Exhibit "2" hereto, ¶11; Export Certificate of Airworthiness, Exhibit "C" to Villela Aff.; and Purchase Agreement, Exhibit "D" to Villela Aff.

6.      Accordingly, EMBRAER is entitled to remove this action to this Court pursuant to 28 U.S.C. §§ 1330 and 1441(d).  The entire action may be removed against all defendants.  In re Surinam Airways Holding Co., 974 F.2d 1255, 1258-60 (11th Cir. 1992).  A Consent and Joinder in Removal on behalf of EMBRAER AIRCRAFT CORPORATION, the only other defendant in this action, is annexed hereto as Exhibit "3."  (It is EMBRAER's position that consent is not necessary for removal under the FSIA, but the form is submitted for convenience.)

7.      EMBRAER will promptly file a Notice of Filing Notice of Removal with the Broward County, Florida, Circuit Court, and will provide a copy of the Notice of Removal to the Court.

8.      Plaintiff filed separate actions in the state and federal court.  The federal action, Yong et al. v. Embraer et al., is Case No. 01-CV-3145-KING/O'SULLIVAN in the Southern District of Florida, Miami Division.  The related action, and three other pending

actions in this court arising out of the Air Fiji accident near Delailasakau, Fiji have been noted on the Civil Cover Sheet.

WHEREFORE, defendant EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A. prays that the above-entitled action now pending in the Circuit Court for the 17th Judicial District of Broward County, Florida, be removed to this Court.

Dated:  Miami, Florida
        April 2, 2003

LAW OFFICES OF JOHN R.W. PARSONS, P.A.

By: _____
    John R.W. Parsons, Esq.
    Florida Bar No. 239674
    Ingraham Building
    25 S.E. Second Avenue
    Miami, Florida   33131-1691
    Tel: (305) 374-3104
    Fax: (305) 377-9805

- and -

CONDON & FORSYTH
Stephen R. Stegich, Esq.
685 Third Avenue
New York, New York  10017
Tel: (212) 490-9100
Fax: (212) 370-4487
Attorneys for Defendant
EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A.

4

## <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed this

<u>2nd</u> day of <u>April</u>, 2003, to:

Steven C. Marks, Esq.
Podhurst, Orseck, et al
City National Bank Building, 8th Floor
25 West Flagler Street
Miami, Florida 33130
Tel: (305) 358-2800
Fax:(305) 358-2382

Gerald C. Sterns, Esq.
Sterns & Walker
901 Clay Street
Oakland, CA 94607
Tel: (510) 267-0500
Fax:(510) 267-0506

LAW OFFICES OF JOHN R. W. PARSONS, P.A.

By:_____
    JOHN R. W. PARSONS

**Exhibit "1"**

IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

GENERAL JURISDICTIONAL DIVISION

| | |
|---|---|
| ESTHER YONG, individually and as personal representative of the estate of PETER CHOON MIN YONG; JONATHAN CHUANG HAO YONG; individually; SAMUEL CHUANG LOONG YONG, a minor, by and through his Guardian ad Litem, ESTHER YONG, all surviving heirs of PETER CHOON MIN YONG, deceased,<br><br>　　　　　　Plaintiffs,<br><br>-vs-<br><br>EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., a foreign corporation for profit; EMBRAER AIRCRAFT CORPORATION, a Florida subsidiary of EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A.,<br><br>　　　　　　Defendants. | 01012417　　**11**<br><br><br>CASE NO. _____<br><br>**COMPLAINT AND JURY DEMAND**<br><br>JUL 1 9 2001<br><br>**A TRUE COPY**<br>HOWARD C. FORMAN<br>CLERK OF CIRCUIT COURT |

COME NOW Plaintiffs ESTHER YONG, individually and as personal representative of

the estate of PETER CHOON MIN YONG; JONATHAN CHUANG HAO YONG; individually;

SAMUEL CHUANG LOONG YONG, a minor, by and through his Guardian ad Litem, ESTHER

YONG, all surviving heirs and successors in interest of PETER CHOON MIN YONG, deceased,

and for their cause of action against the defendants state as follows:

**Jurisdiction and General Allegations**

1.　　The amount in controversy exceeds the jurisdictional minimum of the Court, exclusive of

1

costs and interest, and jurisdiction is otherwise proper before this Court as more fully explained below.

2.  Plaintiffs' decedent, PETER CHOON MIN YONG, is survived by his wife, ESTHER YONG, and two sons, JONATHAN CHUANG HAO YONG; and SAMUEL CHUANG LOONG YONG, a minor, who sues through his Guardian ad Litem, ESTHER YONG. Esther Yong is the personal representative of the decedent's estate. At all relevant times, all plaintiffs and the decedent have been citizens and residents of Australia.

3.  Defendant EMBRAER AIRCRAFT CORPORATION is a Florida Corporation, maintaining its principal place of business in the State of Florida. Said defendant is a wholly-owned subsidiary of defendant EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., a Brazilian Company.

4.  At all relevant times, defendant EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A. conducted regular and systematic commercial activities in the United States, and , in particular, in the State of Florida.

5.  On or about July 24, 1999 plaintiff's decedent was a fare-paying passenger aboard an Embraer Bandeirante aircraft, registered DQ-AFN, and operated as Air Fiji Flight 121 ("the subject aircraft"). At or about 5:40 a.m. Fijian Standard Time, soon after departing from Nausori International Airport, said aircraft encountered severe control and aeronautical problems that caused it to depart unexpectedly and uncontrollably from its flight path and then to crash at low altitude into the mountainous terrain, killing all seventeen people aboard, including plaintiffs' decedent.

2

## COUNT I

## DANGEROUS AND DEFECTIVE DESIGN AND MANUFACTURE OF A PRODUCT

6.   Plaintiffs incorporate herein by this reference and reallege as though fully set forth paragraphs 1 through 5 above.

7.   Defendants EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., and EMBRAER AIRCRAFT CORPORATION, and each of them, were in the business of designing, manufacturing, marketing, testing, inspecting and supplying to the general aviation market the subject Embraer Bandeirante aircraft in question herein as well as certain component parts and systems thereof. Said defendants and each of them further were in the business of placing the subject aircraft and/or component parts and systems into the stream of commerce. The subject aircraft and/or component parts and systems were dangerous and defective in design and manufacture and not fit for their intended purposes as defined in its Type Certificate, Type Certificate Data Sheet, and flight manual, and were further dangerous and defective in that, among other things, the subject aircraft lacked a ground proximity warning mechanism.

8.   Said defects legally and proximately caused and contributed to the crash of Air Fiji Flight 121, as set forth herein.

## COUNT II

## FAILURE TO WARN

9.   Plaintiffs incorporate herein by this reference and reallege as though fully set forth paragraphs 1 through 8 above.

10.   Defendants EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., and EMBRAER AIRCRAFT CORPORATION, and each of them, failed to provide or supply

3

adequate advice, briefing, instructions or warnings as to the defects in design and manufacture as alleged herein. Further, although agents and employees of based in defendants' Florida maintenance facility traveled annually to Fiji to perform inspections and maintenance of Air Fiji's Embraer aircraft, including the subject aircraft herein, defendants and each of them failed to advise, brief, warn or instruct owners, users or operators, including, as in this case, Air Fiji, of said defectively-designed and -manufactured airframe and/or component parts and systems as to the proper maintenance, care, inspection and repair thereof.

11.     Said failure to advise, instruct, brief or warn proximately and legally caused and contributed to the crash of Air Fiji Flight 121, as set forth herein.

**COUNT III**

**NEGLIGENCE**

12.     Plaintiffs incorporate herein by this inference and reallege as though fully set forth paragraphs 1 through 11 above.

13.     Defendants and each of them were negligent in and about the design and manufacture of the subject aircraft and/or its component parts and systems. Said defendants and each of them were further negligent in and about advising, warning, briefing or instructing owners, users or operators of the subject aircraft and/or its component parts and systems as to said defective design and manufacture. Said defendants were further negligent in and about advising, briefing, instructing or warning owners, users or operators, including Air Fiji, of said aircraft and/or its component parts and systems as to proper care, maintenance, repair and inspection thereof. Said defendants were further negligent in ways not yet known to plaintiffs, who reserve the right to amend this complaint accordingly upon ascertaining said further negligence.

4

14. Said negligence proximately and legally caused and contributed to the crash of Alaska Airlines Flight 261, as set forth herein.

15. As a proximate and legal result of this accident and deaths of plaintiffs' decedent herein, plaintiffs and the estate suffered economic and losses, and plaintiffs additionally suffered non-economic losses in that they were deprived of the care, comfort, solace, support, love, and companionship of decedent, all to their general and special damage.

WHEREFORE, plaintiffs prays judgment against defendants and each of them, jointly and severally as follows:

1. For general damages for wrongful death for the heirs and beneficiaries;

2. For survival damages as allowed by law on behalf of the successor in interest and/or estate;

3. For attorneys' fees as may be allowed by law;

4. For costs of suit;

5. For such other and further relief as the court may deem proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

5

Respectfully submitted,

PODHURST, ORSECK, JOSEFSBERG,
EATON, MEADOW, OLIN & PERWIN,
P.A.
25 West Flagler Street, Suite 800
Miami, Florida 33130
(305) 358-2800 / Fax (305) 358-2382
info@podhurst.com

By: _____
AARON S. PODHURST
Fla. Bar No. 063606

By: _____
STEVEN C. MARKS
Fla. Bar No. 516414


STERNS & WALKER

By: _____
GERALD C. STERNS (CSB #029976)

Date: July 19, 2001

901 Clay Street
Oakland, CA 94607
Telephone: (510) 267-0500
Facsimile: (510) 267-0506
E-mail: sterns@trial-law.com

Attorneys for Plaintiffs

6

**Exhibit "2"**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| ESTHER YONG, individually and as personal representative of the estate of PETER CHOON MIN YONG, et al., | )<br>)<br>)<br>) | **Civil Action No.** |
| Plaintiff | )<br>) | |
| vs. | )<br>) | **AFFIDAVIT OF CARLOS ROCHA VILLELA IN SUPPORT** |
| EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A., a foreign corporation for profit, et al. | )<br>)<br>)<br>) | **OF DEFENDANT EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A.'S NOTICE OF REMOVAL** |
| Defendants. | ) | |
| ------------------------------------------------- | x | |

| | |
|---|---|
| State of Sao Paulo | ) |
| | ) ss.: |
| Federative Republic of Brasil | ) |

I, CARLOS ROCHA VILLELA, being duly sworn, depose and say:

1.      I am Executive Vice President and General Counsel at EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A. ("EMBRAER"), a Brazilian aircraft manufacturer based in São José dos Campos, State of São Paulo, Brazil. I have held this position since March 9, 1999. I am authorized and empowered to execute this Affidavit on behalf of EMBRAER.

2.      I am making this Affidavit in support of EMBRAER's Notice of Removal. The facts set forth in this Affidavit are based on my personal knowledge and on EMBRAER business records and other legal documents which I personally reviewed before executing this



Affidavit.

3.      EMBRAER is a Brazilian aircraft manufacturer, and is and has always been incorporated under the laws of the Federative Republic of Brazil.   EMBRAER is not and has never been incorporated under the laws of any of the United States or any third country.

4.      From its founding in 1969 until July 29, 1998, the Brazilian Government owned a majority of EMBRAER's voting shares directly and indirectly.

5.      On August 19, 1969, the Federative Republic of Brazil issued Decree Law No. 770, which authorized the creation of EMBRAER in order to "promote the development of the Brazilian aeronautics industry and related activities, including the design and construction of aircraft and respective accessories, components and equipment, or engaging in technical activities in connection with the production and maintenance of aeronautical material, according to the programs and projects approved by the Executive Branch." A copy of Decree Law No. 770 is attached hereto as Exhibit "A". Articles 4 and 5 of the Decree provided as follows:

> The initial capital stock of EMBRAER shall be NCr\$50,000,000 (fifty million new cruzeiros), corresponding to at least 51% (fifty-one percent) of common registered shares to be subscribed by the Federative Republic of Brazil . . . .
>
> In subsequent issues of common shares as a result of capital increases, the Federative Republic of Brazil shall subscribe to sufficient shares to guarantee a minimum of 51% (fifty-one percent of the voting capital.

Decree Law No. 770, Arts. 4 & 5, Exhibit "A" hereto.

6.      EMBRAER became officially constituted on December 29, 1969. EMBRAER's original By-Laws, a copy of which is attached hereto as Exhibit "B", were published in the *Diario Oficial* of the State of São Paulo on March 10, 1970. As provided in



Article 1 of the By-laws, EMBRAER was established as, and has always remained, a Brazilian corporate person ("sociedade anônima").

7.  EMBRAER's By-Laws further provided, as required by Decree Law No. 770, that the Brazilian Government would continuously own a majority of EMBRAER's voting stock. See EMBRAER's Original By-Laws, Exhibit "B" hereto, Art. 6, § 3.

8.  On December 7, 1994, the Brazilian Government auctioned EMBRAER's shares to private investors, and at a clearance sale on December 13, 1994, the company became "privatized." The Brazilian Government continued to own a majority of EMBRAER's voting shares, directly or indirectly, until approximately July 29, 1998, and continued to retain other ownership interests in the company. The Brazilian Government thereafter has not owned a majority of EMBRAER's voting shares and is no longer required by the By-laws to own a majority of the voting shares.

9.  On July 24, 1999, an EMB-110 model aircraft, Reg. Nº. DQ-AFN, Serial Nº. 110-416, operated as Air Fiji Flight 121 from Nausori, Fiji to Nadi, Fiji, crashed near the village Delailasakau, Fiji. All 17 people on board (15 passengers and 2 crew members) were killed. The Complaint in this action alleges that plaintiffs' decedent was a passenger on Air Fiji Flight 121.

10.  EMBRAER manufactured aircraft DQ-AFN in 1982-83, and it was first sold to an aircraft operator on March 19, 1984. See Export Certificate of Airworthiness, attached hereto as Exhibit "C"; Purchase Agreement No. 313-COI/84 between Embraer and PLM Transportation Equipment Corporation dated March 19, 1984, attached hereto as Exhibit "D". EMBRAER had designed the EMB-110 prior to 1978, the year in which the model was

introduced into civil service.  See Certificate Data Sheet N°. 7202, attached hereto as Exhibit "E".

11.     The Brazilian Government owned a majority of EMBRAER's voting stock outright when the aircraft involved in the Air Fiji accident was designed (prior to 1978), manufactured (1982-83), and sold for the first time to a private operator (1984). After selling the aircraft to PLM Transportation, EMBRAER has never exercised custody or control over the aircraft for any purpose whatsoever.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

4° Tabelião

_____
CARLOS ROCHA VILLELA

Sworn and subscribed to before me this 12 day of March, 2003

_____
Notary Public

4° Serviço Notarial de S. J. Campos
Bel. Santina do Carmo Vieira
Escrevente Substitute

O doc. p/ produzir efeito no Brasil e para valer contra terceiros, deverá ser vertido em verná-culo, e reqistrada a transcrição ( CC, art. 140 LRP, art. 148, 2ª Part.

4

**Exhibit "A"**



REPÚBLICA FEDERATIVA DO BRASIL

## José Martins de Paula e Silva
Tradutor Público Juramentado
Matricula JUCESP N.º 195 - Livro 02 - Fls. 95
OFÍCIO: Rua Nova Barão, Edif. Barão III - 3.º And. - S/ 310 - Tel.: 259-8974 - São Paulo
C P F 172.246.408/91   —   I. A. P. A. S. 10.971.727.764   —   CCM 1.236.052-0

INGLÉS - FRANCÉS





Tradução N.º: JM 3922 Livro: 015    Folha: 151/155 Data 15 / 12/ 1986

EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A.
Address: Caixa Postal 343/12200-São José dos Campos-São Paulo

DECREE-LAW No. 770, dated August 19th, 1969

Published in the Official Gazette of the Country on August 27th, 1969

Authorizes the Country to incorporate EMBRAER - Empresa Brasileira de Aeronautica S.A., and takes other steps.

The President of the Republic, according to assignments to him granted by the 1st paragraph of 2nd Article, Institutional Act No. 5, dated December 13th, 1968, hereby enacts as follows:



### CHAPTER I

### Incorporation of EMBRAER

Art. 1st- The Union is hereby authorized to incorporate, linked to Ministry of Aeronautics, in accordance with this Decree-Law, a mixed economy partnership which will be   denominated EMBRAER - EMPRÊSA BRASILEIRA DE AERONÁUTICA S.A. Sole Paragraph. EMBRAER will have its main   office and jurisdiction in the city of São José dos Campos, State of São Paulo.

Art. 2nd- The objective of EMBRAER will be that of promoting the development of Brazilian aeronautics industries and similar activities,   including the outlining and construction of  aircrafts and respective accessories, parts and equipments, besides the promotion and   performance of technical activities concerning to production and maintenance of aeronautical material, in accordance with programs and projects approved by Executive Power.

1st § - EMBRAER will when necessary, appeal  to indirect performance, by means of agreement, in the event there is any, in the field of private enterprise duly able to develop the duties concerning to respective performance.

2nd § - The progressive implement of aeronautics industry will take into account the criteria related to economical rationality,  including the necessity of securing minimal steps for efficient productions.

3rd § - The Ministry of Aeronautics as well  as any federal bodies of direct or indirect administration, will give priority as to utilization of products and services rendered by EMBRAER.

...to be continued









Art. 3rd - The reading of items 1st and 3rd of Article 38, Decree-Law No. 2.627 dated September 26th, 1940 is not applicable to EMBRAER.

Sole Paragraph - The incorporation of the partnership will be approved by the Executive Power, whose corresponding Minutes will be duly filed at Registry of Commerce through a legalized copy.

CHAPTER II

Capital of EMBRAER

Art. 4th - The initial partnership's capital of EMBRAER will be of NCr$ 50.000.000,00 (fifty million of new cruzeiros), corresponding at least to 51% (fifty-one percent) of registered nominative stocks to be underwritten by the Union, and the remaining represented by ordinary or preferred, nominative or to bearer stocks, intended to be underwritten by natural persons or corporate bodies.

Sole Paragraph - Until the initial capital of EMBRAER is fully paid-up, the reading of Article 14, Decree-Law No. 2.627 of September 26th, 1940 will not be applicable to the partnership.

Art. 5th - The Union, during further issues of ordinary stocks resulting from capital increases, will underwrite the sufficient to assure the minimum of 51% (fifty-one percent) of voting capital.

Art. 6th - In order to fully pay-up the stocks underwritten by the Union, according to capital increases of EMBRAER, the Executive Power is hereby authorized to incorporate the assets, premises, machines, equipments and rights it owns related to manufacture of aeronautics material.

Sole Paragraph - If necessary, the value of said assets and rights will be completed by the Union in currency.

Art. 7th - In fiscal years from 1970 through / 1975, the corporate bodies will have the right of deducting up to 1% (one percent) from due income tax, considering its direct investment up to maturity of the sole quote or last quote of said tax through equal value represented by new stocks of the Enterprise incorporated by this present Decree-Law. (extended until 1980 by Decree-Law No. 1.048 of July 07th, 1975).*

1st § - The fiscal incentive as mentioned in this article will be cumulatively granted together with those in force, being taken into account the maximum limit of 51% (fifty-one percent).

2nd § - The option will be made in respective income tax report, considering that in the event of non investment, the declarer will have to pay it as a duty, plus respective fines.

Art. 8th - The resources called up by the financial institutions according to 2nd article of Decree-Law No. 157 of February 10th, 1967, will have the right of being invested in underwriting stocks of EMBRAER, for apid-up of its initial capital or increases thereof.

CHAPTER III

The Board of EMBRAER

Art. 9th - EMBRAER will be managed by a Board of

...to be continued...

of Directors empowered with normative functions, and by an Executive Board.

1st § - The Board of Directors will be formed as follows:

I  - A President appointed by the President of the Republic, through assignment made by the Ministers of Aeronautics and Industry and Commerce, dismissable "ad nutum";

II  - Three counsellors appointed by the President of the Republic, through indication made by the Ministers of Finance, Industry and Commerce, Planning and General Coordination with a three year tenure;

III - Two counsellors elected by the General Assembly, with a three year tenure;

IV  - A Director-Superintendent.

2nd § - The Executive Board, which will be responsible for all executive and administrative functions of EMBRAER, will be constituted by a Director-Superintendent and Executive Directors as mentioned in its By-Laws, chosen by a General Assembly.

Art. 10th - The Fiscal Board will be constituted by three members, with one year tenure;

1st § - For the constitution of Fiscal Board, the Union will appoint a representetive, the corporate bodies of public right and mixed economy partnerships will appoint the second and natural persons and corporate bodies with private right, will appoint the third representative.

2nd § - While the Fiscal Board is not constituted, according to prior paragraph, all its members will be elected by the General Assembly.

3rd § - The reading of Decree-Law No. 2.928, of December 31st, 1940, is not applicable to Fiscal Board of EMBRAER.

Art. 11th - The exercise of positions and functions pertinent to members of Board of Directors, Executive Board and Fiscal Board of EMBRAER, will be performed by Brazilians.

Art. 12th - The members of Board of Directors and Executive Board, will have their wages establhised by the General Assembly.

Sole Paragraph - The wages related to director-superintendent and executive directors will be established according to conditions of working regional market.

CHAPTER IV

General  Provisions

Art. 13th - EMBRAER will have the right of requiring militaries and civil servants through petition to Ministry of Aeronautics, for performance of its activities.

Sole Paragraph - The civil servants so required, will continue receiving their wages and advantages, having also the right of receiving gratifications from EMBRAER, according to wage level of the function so performed.

Art. 14th - The managers and employees of EMBRAER, as well as the militaries and civil servants working there, will have the obligation of keeping strict secrecy as to tasks and duties they are intrusted at EMBRAER.

...to be continued...









Art. 15th - EMBRAER will be exempted from all duties and taxes incurred or subject to incur on import of raw materials, supplementary parts, compounds and equipments, machines and devices, without similar domestic products, intended to its production and services.

Sole Paragraph - Above said exemption also comprises those domestic industries which manufacture aeronautic products, as to imports intended to performance of programs approved by the Ministry of Aeronautics and whose projects have been approved by GEIMEC.**

Art. 16th - The Ministry of Aeronautics is authorized to transfer chattels, movable assets and rights, besides the transference to EMBRAER of materials, machines and equipments, EMBRAER needs as to performance of programs related to Ministry of Aeronautics.

Art. 17th - EMBRAER will contribute to formation of technical personnel, necessary for the aeronautical industry and formation of skilled workers, being also authorized to organize courses, grant aid to educational institutions in the country, scholarships, as well as sign agreements with public or private entities, intended to formation of skilled technical personnel.

Art. 18th - The Ministry of Aeronautics will be in charge of supervising the activities of EMBRAER, according to Title IV of Decree-Law No. 200, dated February 25th, 1967.

Art. 19th - This present Decree-Law will be in force as of the date of its publishing, being revoked contrary arrangements.

Brasília, August 19th, 1969, 148th year of the Independence and 81st year of the Republic.

Signed: A. Costa e Silva
        Antônio Delfim Netto
        Márcio de Souza e Mello
        Edmundo de Macedo Soares
        Hélio Beltrão

* Decree-Law No. 1.408 of July 7th, 1975

Extends the validity of fiscal incentive for investment on new stocks of EMBRAER - Empresa Brasileira de Aeronáutica S.A.

The President of the Republic, according to prerogatives to him granted by the 55th article of Constitution,
    DECREES:

Art. 1st - It is hereby extended up to fiscal year of 1980, inclusive, the validity of 7th article and its paragraphs, of Decree-Law No. 770, dated August 19th, 1969, related to deduction by corporate bodies of up to 1% (one percent) from due income tax, for investment on new stocks of EMBRAER - Empresa Brasileira de Aeronática Sociedade Anônima.

Art. 2nd - This present Decree-Law will be in force as of its publishing, being revoked contrary arrangements.

Brasília, July 7th, 1975, 154th year of the Independence and 87th year of the Republic.



...to be continued...

Signed: Ernesto Geisel
        Mário Henrique Simonsen
        J. Araripe Macedo
        Severo Fagundes Gomes

** GEIMEC has stopped its activities. The approval
   as mentioned in the sole paragraph of article
   15th, Decree-Law No. 770/69, must be now ob-
   tained through CDI, a body of Ministry of Indus
   try and Commerce (Praça Mauá, No. 7, 17 andar, RIO
   DE JANEIRO - RJ).-

DSP/AJ - April, 1978

NOTHING ELSE.-DATA UT SUPRA.-WHICH I ATTEST.-.-.-.



TRUE TRANLATION
THE SWORN TRANSLATOR







Exhibit "B"



REPÚBLICA FEDERATIVA DO BRASIL

## José Martins de Paula e Silva
Tradutor Público Juramentado
Matrícula JUCESP N.º 195 - Livro 02 - Fls. 95
OFÍCIO: Rua Nova Barão, Edif. Barão III - 3.º And. - S, 310 - Tel.: 259-8974 - São Paulo
C.P.F 172.246.408-91   —   I. A. P. A. S. 10.971.727.764   —   C.C.M 1.236.062-0

INGLÊS - FRANCÊS

Tradução N.º: 5089   Livro:   033   Folha: 260/273   Data 17 / 02 /1993

I, the undersigned, José Martins de Paula e Silva, Public Sworn Translator, hereby certify that, on this date, I translated from Portuguese into English, a document in the following tenor:

Official Gazette (Diário Oficial)
State of São Paulo –
Year 80 No. 46 – Tuesday, March 10, 1970
Pp. 66/67

EMBRAER - Empresa Brasileira de Aeronáutica S.A.

### PUBLIC SESSION OF CONSTITUTION
### MINUTES

On December 29, 1969, at 03.00 p.m., at the auditorium of the Air Ministry, in the city of Rio de Janeiro, State of Guanabara, in the presence of the Minister of Air, Air-Marshall Márcio de Souza e Mello, Minister of Industry and Commerce, Fábio Riodi Yassuda and the representatives of the Ministry of Finance, Planning and General Coordination, Drs. José Flávio Pécora and Antônio Augusto dos reis Velloso, the representative of the Federal Union duly appointed by Decree dated September 24, 1979, Brigadier General Paulo Victor da Silva and other authorities, the Constitution public session of "EMBRAER - Empresa Brasileira de Aeronáutica S.A." was carried out. The session was opened by the Air Minister, who explained that the session held at that time was performed in accomplishment of the terms of Decree 770 dated August 19, 1969, and aims the Constitution of EMBRAER - Empresa Brasileira de Aeronáutica S.A., in accordance with the legislation applied to Corporations. With this session, as the Minister declared, the initial step is given towards Embraer business life, by substantiating today, all the efforts undertaken by the Air Ministry, with the cooperation of the other State Offices, whose titulars are found here, in order





Page 3 - Continued

expensive; e) decisions sovereignty to Brazil, which assures the implementation of programs elaborated in respect of our capacities and necessities; f) simplification of the know-how transfer system, presently in the hands of the Air Ministry; g) control of cost evolution so that to allow the attainment of prices which enable the placement of its products at the Brazilian marketplace, with no excessive elevation of the values presently accepted by consumers; h) centralization of the purchasing activities, leading to a more economical strategy of product nationalization with the participation of a great number of existing companies; 5) So, the idea of creating a Mixed Economy Society was submitted, through a joint explanation of reasons by the Ministries involved in the problem systematization, to the high appreciation by the President of the Republic; 6) The President of the Republic, in view of the argumentation offered in behalf of the creation of a Mixed Economy Society, by recognizing the feasibility and significant of the enterprise for the country, issued the Decree Law under number 770 dated August 19, 1969, by which the Union is authorized to constitute a mixed economy society under the name "EMBRAER - Empresa Brasileira de Aeronáutica S.A.". Thus, the foundations of a solid implementation of our aeronautic industry have been implemented of our aeronautic industry. 7) Financial resources necessary to Embraer capital and operation have been foreseen and approved by the Ministers of Finance, Industry and Commerce and Planning and General Coordination, presents to Brasilia meeting dated June 26, after examining the then exhibited documentation by the Air Ministry. At that occasion, it was established that, for the next six years, the total of resources estimated to the production amounting NCr$560.000.000,00 (five hundred sixty million new "cruzeiros"), in addition to NCr$25.500.000,00 (twenty-five milion and five hundred thousands new "cruzeiros")for subscription of the initial capital, will be suplied in addition to the annual budget of the Air Ministry, with specific destination to Embraer. As a result of such a decision,, for the 1970 fiscal year, the Minister of Planning and General Coordination informed, by means of the Notification 529 dated October 30, 1969, which is included in the Union budget the amount of NCr$ 40.000.000,00 (forty million new "cruzeiros") in the National Fund of Strategic Areas Development, Project "18.00.1.017 - Projects in the area of Industrial Development and Financing at the private sector". 8) At the end of his words, the Air Minister thanked the high collaboration of the Ministers of Finance, Industry and Commerce, as well as the Minister of the Planning and General Coordination, by the preparation of the basic documents, from which the inclusion of the

to consolidate the Brazilian air industry. After
that, the Air Minister reported the following
with relation to Embraer: 1st) By means of a
mandamus registered in proceeding 3714-69 on May
20, 1969, the President of the Republic, Marshall
Arthur da Costa e Silva, approved the inclusion
of the implementation and development of the
aeronautic industry in Brazil among the main
goals of the Federal Government and authorized
the Air Minister, together with the Ministers of
Industry and Commerce, Planning and General
Coordenation to come to an agreement with foreign
organizations, aiming the attainment of technical
servicing, Know-how and eventually, manufacturing
permits, in order to speed up the process of
absorbing experience necessary to the success of
the national enterprise in this sector. 2nd)
Aiming to perform the development and
implementation strategy of the aeronautic
industry in our country, the Ministries of
Finance, Aeronautics, Industry and Commerce and
Planning and General Coordination, through their
titulars, and "Banco Central da República
Federativa do Brasil" by its President agreed on
organizing a work group with the purpose of
studying and proposing measures for
implementation of an industrial complex which, at
the beginning, would produce the turboprop
aircraft "Bandeirante", the project of which has
been developed by the Aeronautics Technical
Center, and a military training aircraft to the
reaction; 3rd) that said work group, directed by
the Major Brigadier Agemar da Rocha Sanctos,
Chairman of the Commitee for Aeronautic Industry
Development - CODIA, counted on representatives
of said portfolios and Central Bank, with The
Director General of the Aeronautics Technical
Center (CTA), Brigadier General Paulo Victor da
Silva and received assistance of the personnel
from the Air Ministry Ofice. CODIA and CTA: 4th)
Said work group, after studying accurately the
several aspects of the problem, and in
considering the particular aspects of the type
and business structure suitable to the aeronautic
production, suggested the creation of a Mixed
Economy society, which presents, among others,
the following advantages: a) rupture of the
vicious circle, which did not enable the
implementaton of the program through the
individual private enterprise; b) engagement of
the private entrepreneur, under the form of
subcontracts, allowing the creation of an
effective industrial structure which, in the
future, will be able to enlarge and even arrogate
the central activity, now dynamized by the
government; c) a greater facility of
capitalization, since both the presence and
participation of the government provide a high
degree of responsibility to the enterprise,
encoraging the participation of the • private
entrepreneur; improvement of new existing means,
avoiding structural duplication, which are always

aeronautic industry implementation resulted,
among the main government's goals, as well as the
promulgation of said Decree Law 770-69, which
authorized Embraer constitution. After that, the
floor was given to the Federal Union's
representative, Brigadier General Paulo Victor da
Silva, who declared that: 1) the Decree Law 770
dated August 19, authorized the constitution of a
mixed economy society under the corporate name
"Embraer - Empresa Brasileíra de Aeronáutica
S.A.; 2) Embraer aims a)-to promote the
development of Brazilian aeronautic industry and
related activities; b)- to design and construct
aircrafts and their respective accessories,
components and equipments; c)- to promote or
perform technical activities bound to the
production and maintenance of aeronautic
material, according to programs and projects as
approved by the Executive Power; 3) after the
promulgation and publication of said decree law,
a work group has been constituted next to the
Commitee for Aeronautic Industry Development
(CODIA), with representatives of the Ministries
of Air, Finance, Industry and Commerce and
Planning and General Coordination, and Central
Bank, for studies and preparation of Embraer by-
laws.; 4) said work group, presided by the Major
Brigadier Agemar da Rocha Sanctos, prepared the
the By-laws project which, after approval by the
Ministers of Air, Finance, Industry and Commerce,
Planning and General Coordination, were approved
by the Executive Power by means of Decree 65.482
dated October 21, 1969; 5) the basic structure of
the company was established in accordance with
provisions of Decree Law 770.69, the following
governmental agencies being foreseen: a)- Board
of Directors, b)- Executive Board of Directors;
c)- Fiscal Council; d)- General Meeting; 6) the
initial capital of the company is fifty million
new "cruzeiros", divided into five million shares
in the face value of ten new "cruzeiros" each;
7) the Federal Union integrated in this act five
hundred thousands registered common stocks,
amounting five million new "cruzeiros"; 8) the
remaining initial capital will be paid up by
special credit in the 1970 fiscal year, and it is
represented by two million and fifty thousands
registered common stocks to be subscribed by the
Union, for one million and nine hundred and fifty
common stocks, whether registered or to the
bearer and for five hundred thousand preferred
stocks, whether registered or to the bearer,
which can be subscribed by individuals or legal
entities; 9) Embraer will enjoy fiscal incentives
relative to the income tax both to individuals
and legal entities, as well as tax and fees
exemption for importation of raw material,
complementary parts, components and equipments,
machines and devices, which have no national
similarity; 10) Embraer can receive movable and
immovable assets, as well as material, machines

AUTENTICAÇÃO
Autentico a cópia reprográfica.
Extraídas nestas notas.

Em Test.: _____ em verdade
JORGIA CRISTINA LIPARELLI DA SILVA
Escrevente autorizada
RG. 21.216.668 - SSP - SP
Prov 58/89
Válido c/ selo de autenticidade

Page 5 - Continued







and equipments belonging to the Air Ministry, necessary to the execution of programs, by the company, which are of said ministry's concern. 11) the supervision of Embraer's activities is of the Air Ministry competence, according to the terms of Title IV of Decree Law 200, dated February 25, 1967 as amended by Decree Law 900, dated September 29, 1969; 12) Embraer will be ruled by the following social bylaws, as approved by the Executive Power through Decree 65.482 dated October 21, 1969: CHAPTER I - Corporate Name, Object and Duration. Article 1) - The mixed economy company "Embraer - Empresa Brasileira de Aeronáutica" will be ruled by Decree law 770 dated August 19, 1969, by the legislation applicable to corporations and by the present bylaws. Sole Paragraph - Embraer is bound to the Air Ministry, whose minister exercises the supervision of its activities, pursuant to the terms an in the manner foreseen in Title IV of decree law 200, dated February 25, 1967. Article 2) Embraer has its social seat and forum in the city of São José dos Campos, State of São Paulo, being able to open branches, offices or agencies, and appoint agents or representatives in any point of the country or overseas, as well as to act as representative of national and foreign companies. Article 3) Embraer has the following objectives: I- To promote the development of the national Brazilian development and related activities. II- To project and construct aircrafts and their respective accessories, components and equipments. III- To promote or perform technical activities bound to production and maintenance of the aeronautic material, in accordance with programs and projects as approved by the Executive Power. IV- To contribute to form technical personnel necessary to aeronautic industry and preparation of qualified workers, being able, for such a purpose, to organize courses, grant aids to teaching establishment of the country, scholarship and also to sign agreements with public or private entities, in order to form specialized technical personnel. Article 4 - Whenever possible, Embraer will appeal to indirect execution by means of an agreement, since a private enterprise exists in the area, which is able to develop the execution charges. Sole paragraph - The implementation of the aeronautic industry will follow economic rationality criteria, including as for the need of assuring minimume effective production scales. Article 5 - The duration term of Embraer is indeterminate. CHAPTER II - Capital Stock, Shares and Shareholders - Article 5)- The initial capital stock is NCr\$50.000.000,00 (fifty million new cruzeiros) divided into 5.000.000 shares in the face value of NCr\$10,00 (ten new cruzeiros) each, from which 2.550.000 in registered common stocks to be necessarily subscribed by the Union, 1.950.000 in common stocks whether registered or to the bearer, and 500.000 in preferred stocks,







whether registered or to the bearer. Paragraph 1
- Only common stocks will be entitled to vote.
Paragraph 2 - Preferred stocks will be entitled,
with priority, to a minimum noncumulative
dividend of 6% per annum, and will have
preference at the capital reimbursement.
Paragraph 3 - Shares will be represented whether
by simple or multiple titles, the respective
substitution being allowed to the shareholders,
with the corresponding charges being incumbent on
them, limited to the cost price. Paragraph 4 -
Share values will be paid in ten equal
installments, the first of them being paid upon
the subscription and the others by means of
Executive Directors' calls, duly authorized by
the Board of Directors. Article 7 - Titles or
certificates representing the shares will be
signed by the Chief Executive Officer, and by
other Executive Director. Sole Paragraph - Titles
or certificates representing registered shares
can be signed by attorneys-in-fact, constituted
for this purpose by the Executive Board of
Directors. CHAPTER III - Embraer agencies -
Section 1 - Board of Directors - Article 8 - The
Board of Directors, which is incumbent on the
normative functions of Embraer activities is
constituted by: I - One Chairman, appointed by
the President of the Republic, by joint
indication of the Air and Industry and Commerce
Ministers, being dismissible "ad nutum. II - 3
Counselors appointed by the President of the
Republic, by indication of the Finance, Industry
and Commerce and Planning and General
Coordination Ministers, with a three-year
mandate, which may be reconducted. III - Two
Counselors, elected by the General Meeting with a
three-year mandate, which may be reconducted. IV
- One Chief Executive Oficer, elected by the
general Meeting. Paragraph 1 - It is privative of
Brazilian people the investiture as a member of
the Board of Directors. Paragraph 2 - Both the
Chairman and the Counsellors will receive an
attendance bonus per each meating they attend, as
stipulated by the Genetal Meeting. Article 9 - It
is incumbent to the Chairman of the Board of
Director: I - To preside the General Meeting and
call and preside the Board of Directors Meeting.
II - To vest the Board of Directors' members.
III- To submit yearly to the General Meeting, the
report, balance sheet and statement of earnings
and losses, with the Fiscal Council opinion. IV -
To issue the administrative rules as approved by
the Board of Directors. Sole Paragraph. The
Chairman, in case of impediment or absences, will
be substituted by the Chief Executive Officer.
Article 10 - The Board of Directors will
ordinarily meet six times a year, a three-month
interval being allowed between two consecutive
meetings and, specially, by means of a call by
the Chairman or four members. Paragraph 1 - In
order to deliberate validly, it is necessary

Page 7 – Continued







the presence of at least four members of the Council, the quality vote being incumbent on the Chairman, in addition to his own vote. Paragraph 2 – In case of vacancy or impediment of any Counsellor, the Chairman will call the respective substitute, who should be appointed or elected, together with the titular. Section II – The Executive Board of Directors – Article 11 – The Executive Board of Directors, which is incumbent on all executive and administrative functions of Embraer, will be constituted of: I – Chief Executive Officer: II – Industrial Relations Manager; III – Production Manager; IV – Technical Manager; V – Financial Manager and IV – Commercial Manager. Paragraph 1 – The Chief Executive Officer and the other Executive Directors will be elected by the general Meeting, among Brazilians of good reputation, resident in the country, and which possess outstanding technical or administrative experience. Paragraph 2 – The General Meeting will establish the remumeration of the Chief Executive Officer and the remaining Executive Directors in accordance with the regional work marketplace, after observing the principle of wage hierarchy adopted at Embraer' staff. Paragraph 3 – Each Director will pledge, in guarantee for your administration, twenty shares whether proper or offered by third parties. Paragraph 4 – The investiture in the position will be performed by means of a term executed in a proper book. Paragraph 5 – In case of vacancy or renouncement, the Chief Executive Officer will be temporarily substituted by the Production manager, up to the date when his successor is elected by the General Meeting. Paragraph 6 – In case of vacancy, by renouncement, death or definitive impediment of another Executive Board of Directors member, the same will be substituted by the Director as appointed by the Chief Executive Officer, such a substitution lasting until the effective Director is elected by the General Meeting. Article 12 – Each Director will answer personally by deliberations he takes, as well as action he practises and, solidarily, by collective decisions he has participated. Article 13 – Actions, documents or agreement which imply commercial,'bank or patrimonial responsibility to the Society, including the opening and turnover of accounts in credit establishments, the purchase, burdening and disposal of assets and settlements in general, after following the legal applicable dispositions, will obligatorily have two signatures, one of which by the Chief Executive Officer and the other by any of the other Executive Directors or by two attorneys-in-fact constituted for such a purpose. Article 14. The Executive Board of Director is incumbent on to managing and administering the companies´s business, by exercising all powers necessary in order to assure the regular operation of Embraer, observing the administrative rules issued by the







Board of Directors. Paragraph 1 - The Executive Board of Directors will met ordinarily one a month and specially whenever the Chief Executive Oficer calls it, deliberating by the majority of votes. Paragraph 2 - It is incumbent on the Executive Board of Directors to call the General Meetings in those cases as foreseen by law and by the present bylaws. Article 15 - It is incumbent on the Chief Executive Officer: I - To superintend Embraer administrative activities. II - To represent Embraer both actively and passively, within or without the Justice, including the international court, in which Embraer is part, as authorized by the Board of Directors. IV - To operate the financial resources of the company. V - To constitute "ad negotia" and "ad judicia" attorneys-in-fact. VI - To call and preside the Executive Board of Directors Meeting. VII. To submit to the Board of Directors the activity plans, as well as the balance sheet and annual reports of the company's business. VIII - To maintain the Board of Directors informed with relation to the Companies' activities and results of its operations. IX - To admit, contract, commission, classify, promote, transfer, licenciate, award, punish, dismiss and dispense employees of the company and to apply the wage table as proposed by the Executive Board of Directors, duly approved by the Board of Directors. X - To establish and grant bonus to public servant requested to Embraer, in accordance with the wage level of the functions performed by the same in the company. XI - To authorize the disposal of materials, machines and components, equipments and raw material, up to the limit of two hundred times the value of the regional minimum salary. XII - To authorize expenses up to the limit of ten thousand times the value of the regional minimum salary, above which it will be necessary a prior authorization by the Board of Directors. XIII - To certify General Meeting books of the Executive Board of Directors and Fiscal Council meetings, as well as the shareholder's General Meeting blotter book. XIV - To sign together with another Executive Director, the titles or certificates representing Embraer stocks. XV - To appoint, in case of impediment or absence, a substitute for any of the Executive Directors. XVI - To vest the Executive Directors, Sole Paragraph: The Chief Executive Officer will be substituted in his temporary impediments or absences by the Executive Director appointed by him, who, during the the substitution period, will have obligations and rights identical as those of the Chief Executive Officer. Article 16 -The Chief Executive Oficer will be obligatorily a person of recognized competence in both aeronautic and general management fields. Article 17 - It is incumbent on the other Executive Directors to perform the specific attributions of

Page 9 - Continued







their positions. Article 18 - The administration
term of the Executive Board of Directors' member
will be five years, the reelection being allowed.
Sole paragraph - the Executive Directors members
which are not reelected will remain in the
exercise of the respective positions up to April
30 of the subsequent year, when the respective
substitutes should be vested. Section III -
Fiscal Council - Article 19 - Fiscal Council is
composed of three effective members, which are
indicated in accordance with paragraph 1 of
article 10 of Decree Law 770 dated August 19,
1969, and elected by the general Meeting.
Paragraph 1 - The Fiscal Council Members will
have an one-year mandate, having right to be
reelected. Paragraph 2 - Each Fiscal Council
member will have a deputy member elected in
accordance with this article. Paragraph 3 - The
Fiscal Council members will receive an attendance
bonus per meeting they attend, as established by
the General Meeting. Article 20 - The Fiscal
Council Meetings will be presided by a member as
indicated by the Union. Article 21 - In case of
renouncement, death or impediment, the effective
members of the Fiscal Council will be substituted
by the respective deputy members. Article 22 - In
addition to the legally-impeded members,
relatives among them, Embraer's employees and
relatives of the Board of Directors' or
Executive Board of Directors' members are not
allowed to participate as members of the Fiscal
Council. Article 23 - The Fiscal Council will
have attributions and powers as established by
the legislation in force. Section IV - The
General Meeting - Article 24 - The General
Meeting means the shareholders meeting called and
installed according to the law and the present
bylaws, with the purpose of deliberating the
subject of social concern, being specially
incumbent on taking the Board of Directors
accounts, checking and discussing the balance
sheet and the Fiscal Council opinion, in addition
to solve omissive cases in the present bylaws.
Article 25 - The general Meeting will meet
ordinarily once a year and specially whenever
called pursuant to the terms of law or this
bylaws. Paragraph 1 - The General Meeting
constitutes, operates and deliberates always with
the same presence of shareholders representing at
least fifty-one per cent of the capital entitled
to vote. Paragraph 2 - Deliberations of the
general Meting are taken by absolute majority of
votes. Paragraph 3 - The General Meeting can
deliberate only with relation to matter of the
agenda according to the respective call edicts.
Article 26 - The General Meting will be presided
by the Chairman of the Board of Directors, and in
case of his impediment, by the Chief Executive
Ofice, assisted by a secretary and shareholder
selected by him. Article 27 - The Union will be
represented, at the General Meeting, by the Air







Minister. CHAPTER IV - Earnings Distribution - Article 28 - The business year, which will coincide with the civil year, will follow as for the balance sheet, amortization, reserves and dividends, to dispositions of the legislation for corporations and to the present bylaws. Article 29 - After the balance sheet strictly in accordance with the legal rules, it will be deducted from the net profit: I - 5% for the constitution of the Legal Reserve Fund, until it reaches 20% of the capital stock. II - The amount intended for the dividend distribution to preferred stocks. III - The amount intended for dividend distribution to common stocks. IV - 20% for the Research and Development Fund to application in programs of the own company. V - 10% for the Investment Fund. Sole Paragraph - The balance, if any, will remain at the disposal of the General Meeting, which will decide in respect of its application by means of proposal by the Executive Board of Directors. Article 30 - The amount relative to the dividend payment pf shares owned by the Union will be reverted, up to the 1980 fiscal year. in behalf of the Research and Development Fund of the company, the specific legislation being followed. Article 31 - The dividends which are not claimed by the shareholders within the term of five years, will be prescribed on behalf of the compay. CHAPTER V - The Company Receivership - Article 32 - The company will be in receivership in cases as determined by law, the General Meeting being incumbent on electing the liquidator or liquidators, as well as the Fiscal Council which should operate in this period, the legal formalities being followed. CHAPTER VI — General Provisions - Article 33 - The reform of the present bylaws is subject to approval by the Executive Power, as expressed by decree. Article 34 - The concession of financing or guarantee to third parties, under any modality what so ever, for business strange to the social concerns, is forbidden. except the contribution of the Social Security Fund of the Employees. Article 35 - Embraer personnel are subject to the Labor Law Consolidation and Complementary Legislation, and to the system of 48 hours of work per week. CHAPTER VII - Transitory Dispositions — Article 36 - The present bylaws will be included in the public section minutes intended for Embraer, to be held in the Air Ministry. Article 37 - Regardless the beginning date of Embraer operation, its first business year will end on December 30, 1970; 13)- It has been apointed by the President of the Republic in order to integrate Embraer Board of Directors: in the capacities of: President - Dr. Aldo Baptista Franco da Silva Santos, Brazilian, married, industrialist, resident at Avenida Maracanã, 551, Rio de Janeiro, State of Guanabara; Counselors - Dr. José Flávio Pécora, Brazilian, married,







economist, resident at Rua 1, No. 138, Morumbi, São Paulo, Capital, indicated by the Minister of Finance; Dr. Antonio de Deus Vieira Neto, Brazilian, married, lawyer, resident at Rua Duvivier, 49, Apt.701, Rio de janeiro, State of Guanabara, indicated by the Minister of the Industry and Commerce: Dr Antonio Augusto dos reis Velloso, Brazilian, married, economist, resident at Rua General Urquiza, 63 - Apt. 104, Leblon, Rio de janeiro, State of Guanabara, indicated by the Minister of Planning and General Coordination; Deputy Counselors - respectively the engineer José Dion de melo Telles, Brazilian, maried, resident at Rua Eduardo Guinle, 18, Apt. 1602, Rio de janeiro, State of Guanabara; Dr. Alberto Cardoso, Brazilian, married, statistician, resident at Avenida Almirante Tamandaré, 50, Apt. 802, Rio de janeiro, State of Guanabara and Dr. José Luiz de Almeida Bello, Brazilian, married, engineer, resident at Avenida Epitácio Pessoa, 5050, Apt. 401, Rio de Janeiro, State of Guanabara; 14) The Federal Union, in the capacity of majority shareholder of the Company, elects as Counselors: Dr. Victório Walter dos Reis Ferraz, Brazilian, married, industialist. rsident at Avenida Prof. Fonseca Rodrigues, 270, São Paulo, Capital; Dr. Luiz Cásio dos Santos Werneck, Brazilian, maried, lawyer, rsident at Rua Manduri, 109, São Paulo, Capital; Deputy Counselors, respectively Messrs. Mario Amato, Brazilian, married, industrialist, resident at Rua Suécia, 313, São Paulo, Capital, and André Francisco de Andrade Arantes, Brazilian, married, bank clerk, resident at Avenida Rebouças, 3.443, São Paulo, Capital; 15) - In order to constitute Embraer Federal Union elects: for Chief Executive Oficer, the aviator lieutenant-colonel Ozires Silva, Brazilian, married, military, resident in H-19-A, Apt. 109, Aeronautic Technical Center, São José dos Campos, State of São Paulo: for Industrial Relation Manager the engineer Antonio Garcia da Silveira, Brazilian, married, rsident in H-19-B, Apt. 105, Aeronautic Technical Center, São José dos campos, State of São Paulo; for Production Manager the engineer Ozilio Carlos da Silva, Brazilian, married, resident in H-20-B, Apt. 116, Aeronautic Technical center, São José dos Campos, State of São Paulo: for Technical Manager the engineer Guido Fontegalante Pessotti, Brazilian, maried, resident in H-27-D, Apt. 109, Aeronautic Technical Center, São José dos Campos, State of São Paulo; for Financial Manager Mr. Alberto Franco Faria Marcondes, married, bank clerk, resident at Rua Dr. Murici, 760, Apt. 802, Curitiba, State of Paraná: for Commercial Manager the lieutenant-colonel Renato José da Silva, Brazilian, married, military, resident at H-17-C, Apt. 106, Aeronautic Technical Center, São José dos Campos, State of São Paulo; 16) For the Fiscal Council, the Federal Union elects, at the

Page 12 - Continued







present, as members, Messrs: engineer Jorge Diehl, Brazilian, married, resident at Rua Vieira Souto, 510, Rio de Janeiro, State of Guanabara, and Brigadier General RR Adhemar Lyrio, Brazilian, married, military, resident at Rua Conde de Itaguaí, 13, Apt. 302, Rio de Janeiro, State of Guanabara, and as the respective substitutes, Dr. Danilo Marcondes de Souza, Brazilian, married, lawyer, resident at Praça Felix Laranjeiras, 10, Rio de Janeiro, State of Guanabara, and Maor Brigadier RR Manilo Garibaldi Fisher Felizzola, Brazilian, married, military, resident at Avenida Atlântica, 2.440, Bloco 1, Apt. 106, Rio de Janeiro, State of Guanabara; 17) The remuneration policy of the higher level personnel of the company will be in respect of a base salary, established in accordance with the regional work marketplace, according to the same principle as established in sole paragraph of Article 12 of Decree law 770, dated August 19, 1969, and in the manner of number IX of Article 15 of Embraer Social Bylaws; 18) For the beginning of Embraer social activities, said base salary, in view of studies performed at the regional work marketplace, it is stipulated in NCr$1.800,00 (one thousand and eight hundred new cruzieros), which will be reviewed at any time by the Board of Directors, according to the terms of the social bylaws; 19) For the first business year of Embraer, the attendance bonus per meeting is established for the Chairman of the Board of Directors in twice the regional minimum salary of the Company's seat, 20) Likewise, the attendance bonus of the Board of Directors counselors is established in half as much the regional minimum salary of the Company's seat; 21) The attendance bonus of the Fiscal Council members per meeting they attend, is established in half as much the regional minimum salary of the Company's seat; 22) the monthly salary of the Chief Executive Officer is established in three times and a half the base salary of Embraer's higher level personnel. 23) The monthly remuneration of the other Executive Directors is established in three times the mentioned base salary. 24) The Executive Board of Director's members will receive the same number of yearly salary as to the Company's employees; 25) Once all determinations and legal formalities are complied with, he declares, as representative of the Union, that Embraer - Empresa Brasileira de Aeronáutica S.A. is constituted, and the constitutive acts, pursuant to the terms of sole paragraph of Article 3 of Decree Law 770 dated August 19, 1969, should be approved by Decree of the Executive Power. After concluded the speech of the Union representative, the Air Minister invited to take office the Chairman of the Board of Directors, the counselors, the Chief Executive Office, the Fiscal Council member and the Executive Directors which have been present to

Page 13 - Continued





the session. After the respective terms have been
signed for all presents, the Air Minister
declared them vested pursant to the terms of law
and to Embraer bylaws. After that, the Air
Minister gave the floor to the presents. Then,
Dr. Aldo Baptista Franco da Silva Santos,
Chairman of Embraer Board of Directors, took the
floor and said: - Honored by the joint indication
of the honorable Ministers of Air, marshall
Márcio de Souza e Mello, and of the Industry and
Commerce, Fábio Yassuda, and by the confidence of
the honorable President of the Republic, the
Army general Emilio Garrastazu Medici, I return
to render cooperation to the public service, by
assuming the Presidence of the Board of Directors
of "Empresa Brasileira de Aeronáutica. Incumbent
on a complex industrial activity, of the highest
technical level, included among the Federal
Government´s principal goals, EMBRAER will
conjugate and contribute to develop the national
technology in an advanced phase, and will
constitute a propulsory and promoting focus of
important sectors of the Brazilian industry. The
rational and objective guidance established by
the decree law which authorized its constitution
and bylaws determines that Embraer will appeal
whenever possible, to indirect execution and
that, at the progressive implementation of the
aeronautic industry, it will follow criteria of
economical rationality, including as for the need
of assuring minimum scales of an effective
production. The task which was entrusted to
Embraer is extremely difficulty not only due to
the problems common to implementation and
development of a pioneer activity, which involves
dificulties of all sort, but also due to the
need of winning certain dose of pessimism and
incredulity which is natural and understandable
in beginning such a kind of activities. The
importance and difficulty of the task constitute
an encouragement to all of us, and it will serve
as a permanent alert to our need of being
efficient, of using foreign efficiency at
maximum, through the indirect execution, and
being always alert to the economical aspects of
the industrial enterprise which will be Embraer.
I believe that Embraer, in performing an activity
deemed as a preferential one, relying on the
indispensable cooperation of the free enterprise,
having the inestimable support of the Aeronautic
Technical center, from where most of its first
directors come, and by following master guidance
lines, established in its by-laws, it will
render, to the national economics, as well as to
the country, the relevant services which all of
us expect from it. I consider a high privilege to
be called to integrate this team whose standard
of enthusiasm, dynamism, competence and
dedication was already highly showned. I want to
thank in my name and in the name of my fellows,
for the confidence placed in us, and I undertake

Page 14 - Continued

confident in God's help, not to save efforts to
serve efficiently the objectives of Embraer as
well as the interests of the country". - After
that, the Air Ministry gave the floor to the
presents. There being no person candidate to take
the floor, the Minister thanked for the presence
of the Industry and Commerce, the reprsentatives
of the Ministers of Finance, Planning and general
Coordination, the other authorities and people
present, by declaring to be sure of the success
which Embraer should reach, and its results will
represent very much to the Aeronautics in
particular, and to our country in general. There
being nothing else to treat, the honorable Air
Ministry ended the present public session of
which, in order to be recorded, I executed the
present minutes, I Francisco José de Castro
Pimentel, "Ad hoc" Secretary, which is signed by
the State Ministers of Air, Industry and
Commerce, representatives of the honrable
Ministers of Finance and Planning and General
Coordination, by the Chief of the General Staff
of Aeronautics, by the Committee of Development
of Aeronautic Industry Chairman, by the Union's
representative and by the presents.-- Rio de
Janeiro, December 29, 1969. Marcio de Souza e
Mello, Air Minister; Fabio Riodi Yassuda,
Minister of Industry and Commerce; José Flavio
Pécora, representative of the Finance Minister;
Antonio Augusto dos Reis Velloso, representative
of the Minister of Planning; Carlos Alberto Huet
de O. Sampaio, Chief of the General Staff of
Aeronautics; Agemar da Rocha Sanctos, Chairman of
CODIA; Paulo Victor da Silva, representative of
the Union; Aldo Baptista Franco da Silva Santos,
Chairman of the Board of Directors.---------------

CERTIFICATE - Board of Trade
I hereby certify that the first copy of this
document, by decision of the 2nd shift of agents
dated January 20, 1970, was registered today
under number 422.875. São Paulo, above date.
Percival Leite Britto - Secretary general.-------
(5404 - NCr$1.040,00).-


NOTHING ELSE. DATA UT SUPRA. WHICH I ATTEST.--



Exhibit "C"

Case 0:03-cv-60626-JLK Document 5 Entered on FLSD Docket 04/08/2003 Page 47 of 92



REPÚBLICA FEDERATIVA DO BRASIL
MINISTÉRIO DA AERONÁUTICA
CENTRO TÉCNICO AEROESPACIAL
INSTITUTO DE FOMENTO E COORDENAÇÃO INDUSTRIAL
VICE DIREÇÃO DE HOMOLOGAÇÃO E PADRÕES

# CERTIFICADO DE AERONAVEGABILIDADE PARA EXPORTAÇÃO
(EXPORT CERTIFICATE OF AIRWORTHINESS)

Produto Novo
(Product) (New)

Número 8308-01
(Number)

Este documento certifica que o produto abaixo citado cujo descrição detalhada se encontra na Especificação de AERONAVE Nº EA-7202-10 é examinado e
(This certifies that the product described below and more fully described in Specification Nº EA-7202-10 has been inspected

a partir da data deste Certificado está em condições de aeronavegabilidade, de acordo com as limitações aplicáveis dos Requisitos Brasileiros de Homologação Aeronáutica e cumpre com as correições especiais
as of the date of the Certificate is considered airworthy in accordance with the applicable limitations of Brazilian Aeronautical Homologation Aeronautics and in compliance with those special requirements

para importação do país importador a menos das exceções abaixo relacionadas.
of the importing country, except as noted below.)

Esse Certificado não atesta o cumprimento de acordos ou contratos entre o vendedor e o comprador e também não autoriza a operação da aeronave
(This Certificate is not an attestation to compliance with any agreements or contracts between the seller and purchaser nor does it constitute authority to operate the aircraft.)

Produto        aeronave                    Modelo      EMB-110P1
(Product)      (aircraft)                  (Model)

Fabricante     EMBRAER S/A                 Nº de Série  110416 (TT 10:10hs)
(Manufacturer)                             (Serial No)

Motor          Two Pratt & Whitney PT6A-34; Right S/N PC-E57033, (TT 14:55hs); Left
(Engine)       S/N PC-E57057, (TT 15:50hs); ITC E4EA, FAA, USA).

Hélice         Two Hartzell HC-B3TN-3C/T10178B-8R; Right S/N BU 12086,(TT 11:55hs);
(Propeller)    Left S/N BU 12749, (TT 11:55hs); ITC P15EA, FAA, USA).

Exceções       Nenhuma
(Exemptions)   (None)

NOTE:   "This aircraft has received several modifications according to EMBRAER dwg
        nº 110-9000, which are aimed to comply with the SFAR 41 - revision A".

País Importador     U S A
(Importing Country)

"This aircraft covered by this certificate
has been examined, tested and found     to
conform to the type design approved un-
der the type Certificate nº A21SO and to be
in condition for safe operation".

Data     05 de Agosto de 1983
(Date)



M. Aer. - C.T.A.
INSTITUTO DE FOMENTO E COORDENAÇÃO INDUSTRIAL
VICE DIREÇÃO DE HOMOLOGAÇÃO
DIVISAL DE HOMOLOGAÇÃO
São José dos Campos - São Paulo - Brasil

Núcleo da Divisão de Controle de Qualidade
Chef of Quality Control Division
ADJANIS DA COSTA E SILVA - Eng°

AVM 100 VA

**Exhibit "D"**

PURCHASE AGREEMENT NO. 313-C01/84

This Agreement is entered into this 11th day of march, 1984, by and between EMBRAER-Empresa Brasileira de Aeronautica S.A. (EMBRAER) and PLM TRANSPORTATION EQUIPMENT CORPORATION (BUYER), for the purchase and sale of EMBRAER aircraft.

THE SALE COVERED BY THIS AGREEMENT SHALL BE GOVERNED SOLELY BY THE TERMS AND CONDITIONS HEREIN SET FORTH, AS WELL AS BY THE PROVISIONS SET FORTH IN THE ATTACHMENTS HERETO.

THIS AGREEMENT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL IT IS SIGNED BY THE BUYER'S AUTHORIZED OFFICER, AND EXECUTED BY TWO OF EMBRAER'S AUTHORIZED OFFICERS.

1. SUBJECT: This Agreement covers:
   a. One (1) EMB-110P1 BANDEIRANTE aircraft (AIRCRAFT) manufactured by EMBRAER, according to the Technical Specification no. TS-110P1/505, dated February 24, 1982, together with the optional equipment, interior installations and exterior finishing specified in Attachments "A" and "B" hereto, which are made a part of this Agreement.

2. PRICE: The BUYER agrees to pay to EMBRAER, in United States dollars, the total purchase price of US$ 1,837,508.00 (one million, eight hundred thirty-seven thousand, five hundred eight U.S. dollars)

3. PAYMENT: All payments herewith shall be made in immediately negotiable funds to a bank account as instructed by EMBRAER. The total purchase price specified in the previous Article shall be paid by the BUYER, upon acceptance of the AIRCRAFT by the BUYER.

4. DELIVERY:
   a. Subject to payment in accordance with Article 3 herein, and with the provisions of Articles 5 and 6 herein, the AIRCRAFT shall be offered by EMBRAER to the BUYER, for inspection and acceptance, in F.A.F. (Fly Away Factory) condition, at Sao Jose dos Campos, State of Sao Paulo, Brazil, on or before December 16, 1983.

5. ACCEPTANCE AND TRANSFER OF OWNERSHIP:
   a. Unless the BUYER is notified otherwise, the AIRCRAFT will be delivered in accordance with the provisions and date specified in Article 4.a. herein. The BUYER shall have an authorized representative at EMBRAER's facilities to take delivery of the AIRCRAFT.

Page 1 of 6



INITIALS

EMPRESA BRASILEIRA DE AERONÁUTICA

b. The BUYER shall conduct an acceptance flight of the AIRCRAFT, unless waived by the BUYER. The fuel for the AIRCRAFT's acceptance flight will be provided by EMBRAER. After such acceptance flight, the AIRCRAFT will be delivered by EMBRAER to the BUYER with its wing tanks full.

c. If the BUYER finds the AIRCRAFT acceptable, the BUYER shall promptly remit the balance of any payments due under Article 3 herein, and execute the necessary title and risk transfer documents, to effect title transfer.

d. If the BUYER refuses to accept the AIRCRAFT, the BUYER shall immediately give EMBRAER written notice of the specific reasons for such refusal.

e. The BUYER must reinspect the AIRCRAFT within five (5) days after receipt of written notice from EMBRAER that all defects have been corrected.

f. EMBRAER shall not be held liable for any delays in delivery incurred by EMBRAER as a consequence of this procedure.

6. DELAYS IN DELIVERY:
EMBRAER shall not be held liable for any delay in the delivery of the supplies, or in the performance of any act to be performed by EMBRAER under this Agreement, including, but not limited to, delays resulting from, but not restricted to, the following events: force majeure, including war or state of war, civil war, insurrection, fire, accident, explosion, flood, act of government, governmental priorities, requisition, strike, labor troubles, inability, despite due and timely diligence to procure any materials, equipment, accessories, parts or means of transport, or any delay resulting from any failure by the BUYER to perform any action or provide any information contemplated by this Agreement, or any other cause to the extent it is beyond EMBRAER's control or does not result from EMBRAER's fault or negligence.
Any such delays shall extend the time for delivery of the AIRCRAFT by the number of days required for the cause of delay to be corrected, or if the cause of delay is such as to render the performance of this Agreement impossible, except as provided for in Article 19 herein, then this Agreement shall be considered terminated without liability to either party. EMBRAER agrees to use its best effects to avoid or remove any such delays, and to resume performance promptly when such causes are removed.

7. CERTIFICATION: The AIRCRAFT shall be delivered by EMBRAER to the BUYER with an Export Certificate of Airworthiness issued by the Aerospace Technical Center of the Brazilian Ministry of Aeronautics, according to the FAA's Advisory Circular no. 21-2C, and according to the terms and conditions of the Bilateral Agreement for the Reciprocal Acceptance of Airworthiness Certifications, entered into the 16th of June, 1976, between the United States and Brazil. The BUYER shall be responsible, however, for obtaining the American Standard Certificate of Airworthiness for the AIRCRAFT.

8. STORAGE CHARGE:
a. A storage charge of US$ 800.00 (eight hundred U.S. dollars) per day, or any part thereof, may be charged by EMBRAER to the BUYER, commencing on the fifth day after:

Page 2 of 6

INITIALS

EMPRESA BRASILEIRA DE AERONÁUTICA S.A.

    1. The BUYER's failure to perform inspection or reinspection of the AIRCRAFT, as per the date or time period specified in writing by EMBRAER, according to Articles 4.a. or 5 herein, as applicable.

    2. The BUYER's acceptance of the AIRCRAFT when the BUYER defaults in the remittance of any payment due and in taking title to said AIRCRAFT immediately thereafter.

    3. The BUYER's failure, after title transfer, to remove the AIRCRAFT from EMBRAER's facilities, in order to comply with Brazilian Customs Regulations.

b. In the event that the AIRCRAFT's delivery date must be extended by EMBRAER from that which is designated in Article 4.a. herein, due to failure by the BUYER to perform any action or provide any information contemplated by this Agreement, storage charge shall commence on the fifth day after the delivery dates specified in Article 4.a. The BUYER undertakes to pay such charge in United States dollars after each month of delay or part thereof, upon presentation of an invoice by EMBRAER.

9. WARRANTY: The AIRCRAFT will be warranted in accordance with the terms and conditions specified in the Attachment "C" hereto. It is the BUYER's responsibility to provide EMBRAER written notification within five (5) days of any change regarding the BUYER's designated lessee.

10. SPARE PARTS: EMBRAER guarantees the supply of spare parts for the AIRCRAFT for a period of ten (10) years after the production of the last aircraft of the same series. Such items will be supplied according to the prevailing availability, sale conditions and delivery schedule on the date of receipt by EMBRAER of the purchase order, and at the prevailing price on the date of invoicing by EMBRAER.

11. CHANGES:

a. MINOR CHANGES: EMBRAER shall be entitled, without previous notice to the BUYER, to incorporate minor changes to the AIRCRAFT's specifications, prior to delivery, provided that such changes shall not affect the AIRCRAFT's performance, weight, balance, and basic dimensions; structural strength, flying qualities, operational capabilities and/or characteristics; interchangeability of parts; ease of maintenance; or delivery date and price.

b. MAJOR CHANGES: Changes to the AIRCRAFT's specifications beyond those specified in letter "a" of this Article shall be proposed by EMBRAER to the BUYER with a description of their nature and effects. The BUYER shall have a period of twenty (20) days after receipt of such proposal to accept or reject the proposed changes. If no response is given by the BUYER within the referred to twenty (20)-day period, the BUYER shall be deemed to have accepted such proposed change or changes, and this Agreement shall be deemed to be modified accordingly.

c. CHANGES REQUESTED BY THE BUYER: In the event that the BUYER requests changes to the AIRCRAFT's specifications, EMBRAER shall have the right, in its sole discretion, to accept or reject such proposal and shall have the further right to specify whether such changes shall be incorporated in the AIRCRAFT before or after its delivery. The cost to the BUYER of any such changes requested by the BUYER shall be the subject of a separate agreement between EMBRAER and the BUYER.

Page 3 of 6

INITIALS

EMPRESA BRASILEIRA DE AERONÁUTICA S.A.

d. CHANGES DETERMINED BY CERTIFICATION AUTHORITIES: Any changes to the
AIRCRAFT's specifications required by newly promulgated regulations of a
competent civil aircraft authority having an effective date prior to the
delivery of the AIRCRAFT will be incorporated by EMBRAER, at its expense,
prior to the AIRCRAFT's delivery.

12. PUBLICATIONS: EMBRAER shall provide, at no cost to the BUYER or to his
designated lessee, one copy each of the operational and maintenance publi-
cations in English language applicable to each AIRCRAFT sold, up to a
maximum of three AIRCRAFT. For subsequent AIRCRAFT the Buyer will receive
the following publications - Flight Manual, Condensed Flight Crew Check List
and Electrical Wiring Diagrams (customized). The revisions of such
publications will be sent free of charge to the BUYER or to his designated
lessee (except mailing charges) for two (2) years following the delivery of
the AIRCRAFT. After expiration of the two year term, the revision service
should be annually renewed. With respect to the items installed in the
AIRCRAFT, which have their own publications, EMBRAER will furnish the BUYER,
if and when received from the manufacturers, with such publications, in the
same quantity as received and in their original printed form, the updating
of those publications being then made through a direct communication between
the BUYER and the manufacturers of such items. It is the BUYER's
responsibility to provide EMBRAER written notification within five (5) days
of any changes as to the BUYER's designated lessee.

13. ASSIGNMENT: The BUYER's rights and obligations hereunder may not be assigned
without EMBRAER's previous written consent.

14. RESTRICTIONS: This sale does not include the transfer of designs, copy-
rights, and patents, and other similar rights to the BUYER.

15. TAXES: EMBRAER shall pay only such taxes arising from the sale subject of
this Agreement, as may be imposed on it, under the Brazilian law. All other
taxes, imposts, withholding taxes, stamp taxes, and any other similar or
dissimilar taxes as well as any duties shall be borne by the BUYER, as may
be imposed on the sale pertinent to this Agreement, under the laws of the
BUYER's country.

16. MARKETING PROMOTIONAL RIGHTS: EMBRAER shall have the right to show, for
marketing purposes, free of any charge, the image of the BUYER's AIRCRAFT
painted with the BUYER's colors and emblems, fixed in photographs, drawings,
films, slides, audiovisual works, models, or any other medium of expression
(pictorial, graphic, and sculptural works), through all mass communications
media such as billboards, magazines, newspapers, television, movie theaters,
as well as in posters, catalogues, models, and all other kinds of promo-
tional material. EMBRAER shall also have the right to disclose the
existence of this Agreement and its terms.
In the event that the AIRCRAFT is sold to or operated by or for another
company or person, EMBRAER shall be entitled to disclose such fact, as well
as to continue to show the image of the AIRCRAFT, free of any charge, for
marketing purposes, either with the original or the new colors and emblems,
unless notified by the owner or the lessee of the AIRCRAFT not to act in
such a way. Said prohibition, however, shall in no way apply to the promo-
tional materials or pictorial, graphic or sculptural works already existing,
or to any contract for the display of such materials or works already
binding EMBRAER, at the time or receipt of the notifications. The provisions
of this Article shall be included in all future sales or lease agreements
concerning the AIRCRAFT.

Page 4 of 6

17. APPLICABLE LAW: This Agreement shall be construed in accordance with and its performance shall be governed by the law of the Federative Republic of Brazil.

18. ARBITRATION: All disputes arising in connection with this Agreement shall be finally settled under the rules of the American Arbitration Association, by one or more arbitrators appointed in accordance with said rules. The parties agree that the arbitration shall be held at the city of San Francisco, California, United States of America.

19. TERMINATION:
   a. The BUYER's right to terminate this Agreement for default or breach by EMBRAER of any of the provisions or covenants is contingent upon EMBRAER's failure to remedy or correct such default or breach within a reasonable period of time after receipt of written notice from the BUYER; provided, however, the delay of less than ninety (90) days beyond the fixed delivery date of the AIRCRAFT, for whatever reason, shall not be considered to be a default or breach within this clause.
   b. Upon the occurrence of either of the following:
      1. Failure by the BUYER to remit to EMBRAER any payments due, as designated in Article 3 herein, which default shall have continued for ten (10) days.
      2. Failure by the BUYER in the performance or observance of any covenant or provision in the Agreement (other than the payment of any amount payable thereunder), which default shall have continued or not been corrected within ten (10) days after receipt of written notice of such default by EMBRAER.
   c. EMBRAER, in addition to any other remedies that it may have at law or in equity, shall be entitled to terminate this Agreement, and apply the sum of deposits or other payments on hand, received from the BUYER, to damages suffered and any costs and expenses incurred by reason of the default or termination hereof, including, without limitation, the cost of modifying any part of the AIRCRAFT or other Agreement items for purposes of resale.

20. NOTICES: All notices pertaining to this Agreement, permitted or required hereunder, shall be in writing, in the English language, and sent, by registered mail or telex, to the attention of the International Sales Manager as to EMBRAER, and of Charles Kremer, President as to the BUYER, to the addresses indicated below, or to such other addresses as either party may, by written notice, designate to the other.
   a. EMBRAER:
      EMBRAER - Empresa Brasileira de Aeronautica S.A.
      Avenida Brigadeiro Faria Lima, 2170
      12200 Sao Jose dos Campos, SP
      BRAZIL
      Telephone – (0123) 22-7070
                  (0123) 21-3775
      Telex – (391) 1133589
              (391) 1133615
              (391) 1133917

Page 5 of 6

EMBRAER

b. BUYER:
PLM TRANSPORTATION EQUIPMENT CORPORATION
50 California Street, Suite # 3300
San Francisco, CA 94111
USA
Telephone: 415/989-1860
Telex: 34430

21. EXCEPTIONS: Any provisions included in the Attachments "A" or "B" hereto, which are supplementary to or different from the above conditions, shall be the governing ones of this Agreement.

22. INDEMNITY: The BUYER agrees to indemnify and hold harmless EMBRAER and EMBRAER's officers, agents and employees from and against all liabilities, damages, losses, judgment, claims and suits, including costs and expenses incident thereto, which may be suffered by, accrue against, be charged to or recoverable from EMBRAER and/or EMBRAER's officers, agents and employees by reason of loss or damage to property or by reason of injury or death of any person resulting from or in any way connected with the performance of services by employees, representatives or agents of EMBRAER for or on behalf of the BUYER, related to aircraft delivered by EMBRAER to the BUYER, including, but not limited to, technical operations, maintenance and training services and assistance performed while on the premises of the BUYER, while in flight on BUYER-owned aircraft, or while performing any other service, at any place, in conjunction with the aircraft operations of the BUYER.

23. ENTIRE AGREEMENT: This Agreement constitutes the entire agreement of the parties hereto with respect to the sale described as its subject, and supersedes all previous and connected negotiations, representations and agreements between the parties. This Agreement may not be altered, amended or supplemented except by a written instrument executed by both parties.

EMBRAER

By: _____

Name: _____
OZIRES SILVA
Chairman
Title: _____
Chief Executive Officer

By: _____

Name: OZILIO CARLOS DA SILVA
Commercial Director

Title: _____

Date: March 19, 1984.

Place: São José dos Campos, S.P.

Witness: _____

Name: CARLOS P.V. RIBEIRO

BUYER

By: _____

Name: Charles Kremer

Title: President

Date: December 11, 1983

Place: San Francisco, CA

Witness: _____

Name: Kathleen Daniels

Page 6 of 6

EMPRESA BRASILEIRA DE AERONÁUTICA S.A.

◀ EMBRAER

PURCHASE AGREEMENT NO. 313 -COI/84
ATTACHMENT "A"
STANDARD EQUIPMENT LIST
BASIC AIRCRAFT EMB-110 P1/P2 BANDEIRANTE

## ENGINES & EQUIPMENT

Pratt & Whitney PT6A-34 turboprop engines (2),
rated at 750 SHP at 2200 RPM at sea level
Propellers-Hartzell 3 bladed (2), with automatic feathering,
reversible pitch plus constant and overspeed control
Engine fire detection system (2)
Engine fire extinguishing system (2)
Inertial separation system (2)
Engine controls and instruments

## ENGINE INSTRUMENTS

Inter-turbine temperature indicators (2)
Torque indicators (2)
Propeller RPM indicators (2)
Gas generator RPM indicators (2)
Oil temperature gauges (2)
Dual oil pressure gauge (1)
Engine air inlet temperature indicator (1)

## FUEL SYSTEM

Wing integral fuel tanks (2)
Main booster pumps (2)
Standby booster pumps (2)
Fuel quantity gauges (2)
Dual fuel pressure gauge (1)
Fuel flow gauges (2)
Fuel flow totalizer (1)
Cross feed valve (1)
Firewall shut-off valves (2)
Fuel filler caps (2)

## HYDRAULIC SYSTEM

Hydraulic reservoir
Electric boost pump (1)
Engine driven pumps (2)
Dual hydraulic pressure indicator (main pumps)

Hydraulic Sub-systems

Retractable landing gear:
- Gear controls and status lights
- Gear-up warning system
- Main gear tires & wheels (2) 620 x 212-12, 10PR
- Nose gear tire & wheel (1) 6.50-8, 6PR
Emergency gear extention system

INITIALS

Page 1 of 5

EMBRAER

Separate normal brakes (single disc on main wheels)
Normal brake pressure accumulator
Emergency brake system
Emergency brake pressure accumulator
Dual hydraulic pressure indicator (normal & emergency brakes)
Parking brake system
Nose wheel steering system

## ELECTRICAL SYSTEM

Ni-cad battery 24V, 40 A/H (1)
Battery temperature monitoring system
Starter generators - 200 AMP (2)
Static inverters 26V/115V 400Hz (2)
Overvoltage protection system (1)
Voltage regulators (2)
Voltammeters (2)
Circuit breaker panels (2)
Annunciator panel system with self test, master warning and dimmer
Landing lights (2)
Taxi light (1)
Strobe lights (3)
Anti-collision beacons (2)
Navigation lights (3)
Engine nacelle lights (2)
Wheel well lights (2)
Hydraulic compartment light (1)
Cockpit panel lights (with dimmers)
Overhead and circuit breaker panel lights (with dimmer)
Cockpit map lights (2)
Cockpit utility light (1)
Passenger annunciator lights
Cabin lights (10)
Individual passenger reading lights (18)
Baggage compartment lights
Door lights
External power receptacle (1)
Pitot-static heating system

## FLIGHT CONTROLS

Dual flight controls
Manual elevator, rudder & left aileron trim
Electric flaps
Flap position selector & indicator
Flap asymmetry detection system

## FLIGHT INSTRUMENTS

Separate pitot-static systems (for pilot & copilot)
Airspeed indicators (2)
Attitude indicators (2)
Sensitive altimeters (2)
Vertical speed indicators (2)
Turn and slip indicators (2)
Directional gyro (copilot)
Standby magnetic compass (1)
Clock (1)

INITIALS

Page 2 of 3

EMBRAER

## ENVIRONMENTAL CONTROL SYSTEM (Bleed Air)

Three wheel air cycle unit: 25,000 BTU/Hr cooling capacity and,
40,000 BTU/Hr heating capacity
Automatic/Manual temperature control
Windshield defogging
General cabin air outlets
Adjustable air gaspers for each passenger and crew
Bleed air shut-off valves (2)

## COCKPIT INTERIOR ITEMS

Crew seats with height and length adjustment (2)
Crew seat belt and shoulder harness (2)
Cockpit speaker (2)
Storm windows (2)
Adjustable sun visors (2)
Ash trays (2)
Cup and pencil holders (2 ea)

## STRUCTURAL

Front airstairs door (1.42 x 0.63m)
Emergency exits (3)
Hydraulically operated rear cargo door (1.42 x 1.80m)
    with visual display of locking mechanism
Overall sound-proofing
Complete corrosion protection
Jack pads (3)

## MISCELLANEOUS

Cabin smoke detection system
Lightning protection system
Dual speed windshield wipers (2)
Customized exterior paint (polyurethane)
Tow bar
Fire axe
Aircraft logbook (1)
Engine & Propeller logbooks (2 ea)
Pilot's operating handbooks (2)
Checklists (2)
Maintenance manuals (1 set)
Parts catalogs (1 set)
Door keys (2)
Parking kit:
- Flight bag
- Pitot covers (2)
- Engine inlet covers (2)
- Prop stops & exhaust covers (2)
- Chocks (2)
- Control wheel gust strap (1)
- Fuel draining cup (1)
First aid kit

PURCHASE AGREEMENT NO. 313-COI/84

## ATTACHMENT "B"

In addition to the standard equipment specified in Attachment "A", the specific configuration as selected by the BUYER shall also include the items listed hereinbelow. Certain items selected by the BUYER may replace specific standard equipment items listed in Attachment "A" and/or certain avionic features listed in Attachment "B", item 3.

BANDEIRANTE EMB-110P1/SFAR41

1. Optional Systems

   a. Complete anti-icing and deicing, including leading edges deicing boots, propeller and air-intake electric anti-icing and dual electrically heated windshields

   b. Forced air ventilation and recirculation system for cabin and cockpit

   c. Ram air cockpit ventilation system

2. Interior Options

   a. Basic trim passenger/cargo for P1

   b. Partition separating flight deck from main cabin incorporating curtain

   c. Nineteen leather cabin seats with ashtrays, magazine pockets and underseat life vest pouches (seven double seats and five single seats) with numbering system.

   d. Two seat belt extensions (60 cm long)

   e. Partition dividing baggage area from main cabin (in addition to the standard net for P1 model) non-structural

   f. Protective bars for baggage area windows

   g. Low-slope ramps flanking main spar

Page 1 of 3

INITIALS

EMPRESA BRASILEIRA DE AERONÁUTICA S.A.

3. King Silver Crown II Package
   King KY-196 No. 1 VHF/COMM transceiver with Collins 37R-2 antenna.
   King KY-196 No. 2 VHF/COMM transceiver with Collins 37R-2 antenna.
   King KN-53 No. 1 VHF/NAV receiver with Dorne & Margolin DMN21-1 NAV antenna coupler, 837B-1 VOR/ILS antenna and 37P-5 dual glide-slope antenna.
   King KN-53 No. 2 VHF/NAV receiver.
   King KR-87 ADF receiver with KA-44 antenna.
   King KNI-582 RMI with NAV1/ADF1 on single needle and NAV2/ADF2 on double needle.
   King KNR-633 RMI converter.
   King KR-21 marker beacon receiver (pilot) with Collins 37X-2 antenna.
   King KCS-55A compass system with KI-525A HSI (pilot).
   King KN-72 NAV converter.
   King KI-204 VOR/ILS indicator coupled to NAV2 (co-pilot).
   Dual Collins 387C-4 audio control panels with dual 356F-3 speaker amplifiers and 8 speakers (cockpit and cabin).
   Public address system.
   Radio master switch.
   Pilot's interphone system.

4. Options to King Package

   a. King KNS-81 RNAV (exchange for No. 1 KN-53 with removal of KN-72 NAV converter, KNR-633 RMI converter. Requires installation of KN-63 DME system

   b. King KN-63 DME with KDI-572 indicator plus KA-60 antenna

   c. King KT-76A transponder plus KA-60 antenna

   d. Second King KT-76A transponder plus KA-60 antenna

5. Radar

   a. Bendix RDR-1200 Weather Radar with IN-1202B monochromatic indicator and 12" stabilized phased array antenna

6. Auto-pilot

   a. Bendix M4-D auto-pilot with go-around mode

   b. King KA-52 auto-pilot adapter

Page 2 of 3

INITIALS

EMBRESA BRASILEIRA DE AERONAUTICA S.A.

◀ EMBRAER

7. Emergency locator transmitter

   Dorne & Margolin DMELT-6 ELT system

8. Encoding altimeters

   a. Two Smiths' P/N 01-200-102 (Barometric adjustment in
      in.HG)

9. Miscellaneous

   a. Two Telex MRB-600 headsets with boom microphone

10. Interior Finish Materials
    Seats and lower side panels: E3004104;
    Upper side panels and ceiling: E3006663;
    Curtains: E3005764;
    Window frames: E1000162;
    Bulkheads: E3007245;
    Carpets: E3016149.

11. Exterior Finish: The AIRCRAFT shall be painted in accordance with the paint
    scheme already supplied to the factory by the BUYER.

12. Registration Marks: The AIRCRAFT will be delivered to the BUYER with the
    following registration number (N-number) painted on it: N130EM



Page 3 of 3

# WARRANTY CERTIFICATE

1. Embraer, subject to the conditions and limitations hereby expressed, warrants that all EMB-110 BANDEIRANTE aircraft:

    A. For a period of 12 months from the date of delivery to the first Buyer, the aircraft will be free from:

        a. Defects in material, workmanship and manufacturing processes in relation to parts manufactured by Embraer or another manufacturer in accordance to Embraer's drawings and specifications;

        b. Defects inherent to the design of the aircraft and its parts designed and manufactured by Embraer.

        The parts covered within this period of the warranty are:

        Airframe (including sealing and painting)
        Flight control system
        Engine control system
        Landing gear system
        Brake system
        Nose wheel steering system
        Hydraulic system
        Anti-ice and de-icer systems for wings, empennage, windshield, propellers, and power plant air inlet ducts
        Pilots and passenger seats
        Electrical, radionavigation and communication equipment installations.

    B. For a period of 6 months from the date of delivery to the first Buyer, the aircraft will be free from:

        a. Defects in operation of vendor manufactured parts, as well as failures of mentioned parts due to incorrect installation or installation not complying with instructions issued or approved by their respective manufacturers;

        b. Defects due to the non-conformity to the technical specification referred to in the purchase agreement of the aircraft.

        Once the above mentioned period has expired, Embraer will transfer to the Buyer the original warranty issued by the vendor, if it still exists.

2. Embraer, subject to the conditions and limitations hereby expressed, warrants that:

    A. All spare parts or ground support equipment, which have been manufactured either by Embraer or its suppliers in accordance to Embraer's drawings and specifications and stamped with a serial number which will permit its particular identification, and which have been sold by Embraer or its Representatives, will, for a period of 12 months from the date of issue of the invoice, be free from defects of material, workmanship, manufacturing processes and defects inherent to the design of the above mentioned parts or ground support equipment;

    B. All spare parts or ground support equipment which has been designed and is manufactured by Embraer's suppliers, and stamped with a serial number which will permit its particular identification and which has been sold by Embraer or its Representatives, will, for a period of 6 months from the date of issue of the invoice, be free from defects of material and manufacture. Once the above mentioned period has expired, Embraer will transfer to the Buyer the original warranty issued by the supplier, if it still exists.

3. The obligations of Embraer as expressed in this warranty, are limited to substitute or repair, depending solely upon its own criteria, the parts that are returned to Embraer or its Representatives, at the Buyer's own expenses, adequately packed, within a period of 30 days after the occurrence of the defect, provided that Embraer agrees that such components

Parts supplied to the Buyer as substitutes for defective parts are warranted for the balance of the warranty period still available from the original warranty, of the exchanged parts. However, all labor, freight, insurance, taxes and other costs eventually incurred during the removal, shipment to and from Embraer or its Representatives, re-installation and adjustments are the Buyer's responsibility.

4. Embraer will accept no warranty claims under any of the circumstances listed below:

   A. When the aircraft has been used in an attempt to break records, or subjected to experimental flights, or any other way not in conformity with the flight manual or the airworthiness certificate or still, subjected to any way of use in contravention of the applicable aerial navigation or other regulations and rules. issued or recommended by government authorities of whatever country in which the aircraft is operated, when accepted and recommended by I.C.A.O.;

   B. When the aircraft or any of their parts have been altered or modified by the Buyer, without the prior approval by Embraer or by the manufacturer of the parts, through a service bulletin;

   C. Whenever the aircraft or any of their parts have been involved in an accident or parts either defective or not complying to the manufacturer's design or specification have been used;

   D. Whenever parts have had their identification marks, designation, seal or serial number altered or removed;

   E. In the event of negligence, misuse or the performance of maintenance services on the aircraft or any of its parts not in accordance with the respective maintenance manual;

   F. In cases of deterioration, wear, breakage, damage or any other defect resulting from the use of inadequate packing methods when returning items to Embraer or to its Representatives.

5. This warranty does not apply to defects presented by expendable items, whose service life or maintenance cycle is lower than the warranty period, and to materials or parts subjected to deterioration, including, but not limited to: gaskets, seals, trims and plastics, rubber-like items, filter elements, light bulbs, sealed beams, fuses, tires and tubes, plexiglass and acrylics in general (except windshield), brake pads, alkaline battery cells, interior linings and upholstery.

6. The warranty hereby expressed is established between Embraer and the first Buyer, or his designated lessee, through the corresponding purchase agreement, of which it is an attachment, and it cannot be transferred or assigned to others, unless by written consent of Embraer.

7. THE WARRANTIES, OBLIGATIONS AND LIABILITIES OF EMBRAER AND REMEDIES OF THE BUYER SET FORTH IN THIS WARRANTY CERTIFICATE ARE EXCLUSIVE AND IN SUBSTITUTION FOR, AND THE BUYER HEREBY WAIVES, RELEASES AND RENOUNCES, ALL OTHER WARRANTIES, OBLIGATIONS AND LIABILITIES OF EMBRAER AND ANY ASSIGNEE OF EMBRAER, AND ANY ASSIGNEE OF EMBRAER AND RIGHTS, CLAIMS AND REMEDIES OF THE BUYER AGAINST EMBRAER OR ANY ASSIGNEE OF EMBRAER, EXPRESSED OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY NON-CONFORMANCE OR DEFECT IN ANY AIRCRAFT OR OTHER THING DELIVERED UNDER THE PURCHASE AGREEMENT OF WHICH THIS IS AN ATTACHMENT, INCLUDING BUT NOT LIMITED TO:

   A. ANY LIMITED WARRANTY OR MERCHANTABILITY OR FITNESS;

   B. ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE;

   C. ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM THE NEGLIGENCE, OR OTHER RELATED CAUSES OF EMBRAER OR ANY ASSIGNEE OF EMBRAER, ACTUAL OR IMPUTED;

   D. ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY FOR LOSS OF OR DAMAGE TO ANY AIRCRAFT, FOR LOSS OF USE, REVENUE OR PROFIT WITH RESPECT TO ANY AIRCRAFT OR FOR ANY OTHER DIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

8. No Representative or employee of Embraer is authorized to establish any other warranty than the one hereby expressed, nor to assume any additional obligation, relative to the matter, in the name of Embraer.

Exhibit "E"

REPÚBLICA FEDERATIVA DO BRASIL
Ministério da Aeronáutica
CENTRO TÉCNICO AEROESPACIAL
INSTITUTO DE FOMENTO E COORDENAÇÃO INDUSTRIAL
VICE DIREÇÃO DE HOMOLOGAÇÃO – DIVISÃO DE HOMOLOGAÇÃO

A E R O N A V E

# Certificado de Homologação de Tipo

NÚMERO 7202

Êste Certificado, emitido com base na Portaria nº 9.815 de 16 de maio de 1974, em nome da
EMPRÊSA BRASILEIRA DE AERONÁUTICA S.A.

certifica que o projeto de tipo para o produto abaixo citado, satisfaz as condições de aeronavegabilidade do requisito    1340 /
dos Requisitos Brasileiros de Homologação Aeronáutica, desde que sejam observadas as limitações operacionais e demais condições
especificadas nêstes Requisitos e na Especificação de Aeronave nº EA 7202-07

E M B - 1 1 0

Êste Certificado e a respectiva Especificação de Aeronave            do qual faz parte, serão
válidos até que sejam cancelados por devolução, suspensão, revogação ou um prazo limite sêja estabelecido pelo Centro Técnico Aeroespacial.

| Data do pedido de homologação: | | Data da emissão: |
|---|---|---|
| MODELO EMB-110 S1 | – 06 FEV 1976 | 19 OUT 1976 |
| MODELO EMB-110 P2 | – 21 MAR 1977 | 15 SET 1977 |
| MODELO EMB-110 K1 | – 29 MAR 1976 | 09 JAN 1978 |
| MODELO EMB-110 P1 | – 14 FEV 1977 | 09 MAI 1978 |

Em 09 de    Maio    de 1978.

Chefe da Divisão de Homologação
ANTONIO BAKOWSKI – Engº Aer

Vice-Diretor de Homologação
MILTON NARANJO – Ten Cel Av



MINISTÉRIO DA AERONÁUTICA
DEPARTAMENTO DE PESQUISAS E DESENVOLVIMENTO
CENTRO TÉCNICO AEROESPACIAL

### TYPE CECIFICATE DATA SHEET N° EA-7202

Type Certificate Holder:

EMBRAER - EMPRESA BRASILEIRA DE AERONÁUTICA
P. O. Box, 343
São José dos Campos/SP

<table>
<tr><td>

EA-7202-12

Page 1

EMBRAER

EMB-110P2
EMB-110K1
EMB-110P1

FEBRUARY 1992

</td></tr>
</table>

VIII - MODEL EME-110P2 (Normal Category), approved September 15, 1977. The EME-110P2 model is a derivative of the basic EMB-110 model. The main differences are: a stretched fuselage ($^{+}$33.5 in), a new power-plant and new seats, incorporated in accordance with EMBRAER drawing N° 110P2-0000.

| | |
|---|---|
| **ENGINE** | 2 Pratt & Whitney of Canada Ltd<br>Pratt & Whitney PT6A-34. |
| **FUEL** | JP-4, JP-5, Avjet A, Avjet A-1 and Avjet-B per P&W specifications PWA522 or CPW46.<br>See Note 5. |
| **OIL** | In accordance with P&W Specification PWA521 or CPW202 (MIL-L-23699A). |

| ENGINE LIMITS | EHP | SHP | PROP SHAFT SPEED | TIT (°C) |
|---|---|---|---|---|
| Takeoff .................. | 783 | 750 | 2200 | 790 |
| Max. Continous .......... | 783 | 750 | 2200 | 790 |
| Starting (2 sec) ......... | – | – | – | 1090 |
| Max. Reverse (1 min.) .... | – | 400 | 2068 | 790 |

| PROPELLER AND PROPELLER LIMITS | 2 Hartzell HC-B3TN-3C/T10178H-8R, diameter 93 in ( no further reduction permitted ), spinner Hartzell D3434-5, 5P, 6P, 12P, 17P, 18P; or |
|---|---|
| | 2 Hartzell HC-B3TN-3D/T10178HB-8R, diameter 93 in ( no further reduction permitted ), spinner Hartzell D3434-6, 6P, 12P, 17P, 18P; or |
| | 2 Hartzell HC-B3TN-3C/T10178HB-8R, diameter 93 in ( no further reduction permitted ), spinner Hartzell D3434-6, 6P, 12P, 17P, 18P. |
| | Pitch settings at 30 in.sta.<br>- Reverse: $- 11°$<br>- Feather: $^+ 88.1°$<br>- Primary pick-up angle: $^+ 20.2°$<br>- Secondary low pitch stop angle: 14° |
| AIRSPEEDS LIMITS (IAS) | Max. operating speed:<br>252 mph (230 knots)<br>Maneuvering Speed:<br>195 mph (169 knots)<br>(See Pilot's Operating Handbook)<br>Max. landing gear extended and operating speed = 168 mph (146 knots)<br>Maximum flap extension speed:<br>25% - 207 mph (180 knots)<br>100% (38°) - 170 mph (148 knots) |
| C.G. RANGE<br>(Landing gear extended) | (255.5) to ($^+$272.0) at 12.500 lb.<br>($^+$251.3) to ($^+$272.0) at 8818 lb or less.<br>Straight line variation between points given.<br>Moment change due to retraction of landing gear: - 10068 in lb<br>(The CG is shifted forward with rectraction of landing gear). |

EMBRAER                  FEBRUARY/1992              EA-7202-12              Page   3

| | |
|---|---|
| **MAXIMUM WEIGHT** | Takeoff  : 12500 lb ( See   Note 1.a and 1.c ) |
| | Landing  : 12015 lb (See  Note 13 and Note 1.c) |
| | Zero Fuel: 12015 lb |
| | Ramp     : 12566 lb |
| **MINIMUM CREW** | One pilot (VFR conditions) (See Note 6.c) |
| **NUMBER OF SEATS** | Maximum 23 seats (21 passangers , 2 crew) |
| **MAXIMUM BAGGAGE** | 529 lb  ($^{+}$417) See Note 1.d |
| **FUEL CAPACITY** | 454 gal (227 gal each tank) (+283.5) Unusable fuel 7.5 gal (3.75 gal each tank) |
| **OIL CAPACITY** | 9.2 qt. in  each  engine  ($^{+}$226.4) 1 qt. in each oil radiator ($^{+}$226.0) |
| **MAXIMUM OPERATING ALTITUDE** | 25000 ft |
| **OPERATION TEMPERATURE LIMITS** | ISA + 28°C and $^{-}$40°C |
| **SERIAL N°S ELEGIBLE** | 110146 and up |

IX   -  MODEL EMB-110K1 (Normal Category), approved January 9, 1978.
The EMB-110K1 model is a derivative of the basic EMB-110 model.
The main differences are: a stretched fuselage ($^{+}$33.5 in), a new
power-plant, a reinforced floor and a cargo door,  incorporated in
accordance with EMBRAER drawing N° 110K1-0000.

| | |
|---|---|
| **ENGINE** | 2 Pratt & Whitney of Canada Ltd Pratt & Whitney PT6A-34. |

EMBRAER                  FEBRUARY/1992              EA-7202-12                    Page  4

---

**FUEL**                                JP-4,  JP-5,  Avjet A,  Avjet A-1 and
                                        Avjet-B per P&W specifications PWA522 or
                                        CPW46.
                                        See Note 5.


**OIL**                                 In accordance with P&W Specification
                                        PWA521 or CPW202 (MIL-L-23699A).


| ENGINE LIMITS | EHP | SHP | PROP SHAFT SPEED | TIT (°C) |
|---|---|---|---|---|
| Takeoff ................. | 783 | 750 | 2200 | 790 |
| Max. Continous .......... | 783 | 750 | 2200 | 790 |
| Starting (2 sec) ........ | - | - | - | 1090 |
| Max. Reverse (1 min.) .... | - | 400 | 2068 | 790 |


**PROPELLER AND**                       2  Hartzell   HC-B3TN-3C/T10178H-8R,
**PROPELLER LIMITS**                    diameter  93  in  ( no  further
                                        reduction    permitted ),         spinner
                                        Hartzell D3434-5, 5F, 6P, 12P, 17P, 18P;
                                        or

                                        2      Hartzell     HC-E3TN-3D/T10178HB-8R,
                                        diameter   93   in   ( no   further
                                        reduction    permitted ),         spinner
                                        Hartzell D3434-6, 6P, 12P, 17P, 18P; or

                                        2    Hartzell    HC-E3TN-3C/T10178HB-8R,
                                        diameter   93   in    ( no   further
                                        reduction    permitted ),         spinner
                                        Hartzell D3434-6, 6P, 12P, 17P, 18P.

                                        Pitch settings at 30 in.sta.
                                        - Reverse: - 11°
                                        - Feather: + 88.1°
                                        - Primary pick-up angle: + 20.2°
                                        - Secondary low pitch stop angle:  14°

| AIRSPEEDS LIMITS (IAS) | Max. operating speed:<br>252 mph (230 knots)<br>Maneuvering Speed:<br>195 mph (169 knots)<br>(See Pilot's Operating Handbook)<br>Max. landing gear extended and operating<br>speed = 168 mph (146 knots)<br>Maximum flap extension speed:<br>25% - 207 mph (180 knots)<br>100% (38°) - 170 mph (148 knots) |
| C.G. RANGE<br>(Landing gear extended) | (255.5) to (+272.0) at 12.500 lb.<br>(+251.3) to (+272.0) at 8818 lb or<br>less.<br>Straight line variation between points<br>given.<br>Moment change due to retraction of landing<br>gear: - 10068 in lb<br>(The CG is shifted forward with<br>rectraction of landing gear). |
| MAXIMUM WEIGHT | Takeoff  : 12500 lb (See  Note 1.a)<br>Landing  : 12015 lb (See Note 13)<br>Zero Fuel: 12015 lb<br>Ramp     : 12566 lb |
| MINIMUM CREW | One pilot (VFR conditions)<br>(See Note 6) |
| NUMBER OF SEATS | 2 seats (2 crew).<br>Only approved in the cargo version.<br>Maximum floor loading 100 lb/sq ft (See<br>Pilot's Operating Handbook for loading<br>instructions).<br>Maximum payload - 3977 lb |
| MAXIMUM BAGGAGE | Not aplicable. |
| FUEL CAPACITY | 454 gal (227 gal each tank) (+283.5)<br>Unusable fuel 7.5 gal (3.75 gal each tank) |

| OIL CAPACITY | 9.2 qt. in each engine   ($^+$226.4)<br>1 qt. in each oil radiator ($^+$226.0) |

| MAXIMUM OPERATING ALTITUDE | 25000 ft |

| OPERATION TEMPERATURE LIMITS | ISA +28°C and $^-$40°C |

| SERIAL N°S ELEGIBLE | 110169 and up |

X  -  MODEL EMB-110P1 (Normal Category), approved May 9, 1978.
     The EMB-110P1 model is a derivative of the basic EMB-110 model.
     The main differences are: a stretched fuselage ($^+$33.5 in), a new
     power-plant, a reinforced floor and a cargo door, incorporated in
     accordance with EMBRAER drawing N° 110P1-0000.

| ENGINE | 2 Pratt & Whitney of Canada Ltd<br>Pratt & Whitney PT6A-34. |

| FUEL | JP-4,  JP-5,  Avjet A, Avjet A-1 and<br>Avjet-B per P&W specifications PWA522 or<br>CPW46.<br>See Note 5. |

| OIL | In accordance with P&W Specification<br>PWA521 or CPW202 (MIL-L-23699A). |

| ENGINE LIMITS | EHP | SHP | PROP SHAFT SPEED | TIT (°C) |
|---|---|---|---|---|
| Takeoff ................. | 783 | 750 | 2200 | 790 |
| Max. Continous .......... | 783 | 750 | 2200 | 790 |
| Starting (2 sec) ........ | - | - | - | 1090 |
| Max. Reverse (1 min.) .... | - | 400 | 2068 | 790 |

| PROPELLER AND PROPELLER LIMITS | 2  Hartzell   HC-B3TN-3C/T10178H-8R,<br>diameter   93   in   ( no  further<br>reduction    permitted ),      spinner<br>Hartzell D3434-5, 5P, 6P, 12P, 17P, 18P;<br>or |

2     Hartzell     HC-B3TN-3D/T10178HB-8R,
diameter     93     in     ( no     further
reduction     permitted     ),          spinner
Hartzell D3434-6, 6P, 12P, 17P, 18P; or

2     Hartzell     HC-B3TN-3C/T10178HB-8R,
diameter     93     in     ( no     further
reduction     permitted     ),          spinner
Hartzell D3434-6, 6P, 12P, 17P, 18P.

Pitch settings at 30 in.sta.
- Reverse: - 11°
- Feather: $^+$ 88.1°
- Primary pick-up angle: $^+$ 20.2°
- Secondary low pitch stop angle:
  14°

**AIRSPEEDS LIMITS (IAS)**

Max. operating speed:
252 mph (230 knots)
Maneuvering Speed:
195 mph (169 knots)
(See Pilot's  Operating Handbook)
Max. landing gear extended and operating
speed = 168 mph (146 knots)
Maximum flap extension speed:
25% - 207 mph (180 knots)
100% (38°) - 170 mph (148 knots)

**C.G. RANGE**
**(Landing gear extended)**

(255.5)  to  ($^+$272.0) at  12.500 lb.
($^+$251.3) to  ($^+$272.0) at  8818 lb or
less.
Straight  line  variation  between  points
given.
Moment change due to retraction of landing
gear: - 10068 in lb
(The   CG   is   shifted   forward   with
rectraction of landing gear).

**MAXIMUM WEIGHT**

Takeoff  : 12500 lb  (See  Note 1.a)
Landing  : 12015 lb (See  Note 13)
Zero Fuel: 12015 lb
Ramp     : 12566 lb

EMBRAER                    FEBRUARY/1992          EA-7202-12                    Page   8

---

MINIMUM CREW                    One pilot (VFR conditions)
                                (See Note 6)


NUMBER OF SEATS                 21 seats (maximum)
                                - 18 passengers, 3 crew or
                                - 19 passangers (side facing),2 crew
                                  This configuration is approved only in
                                  the private transport category (FAR 91)
                                - cargo configuration
                                  maximum loading 488 kgf/m$^2$ (100 lb /ft$^2$)
                                - maximum payload - 3977 lb

MAXIMUM BAGGAGE                 705 lb ($^+$409) (See Note 1.e)


FUEL CAPACITY                   454 gal (227 gal each tank)  (+283.5)
                                Unusable fuel 7.5 gal (3.75 gal each tank)


OIL CAPACITY                    9.2 qt. in  each  engine   ($^+$226.4)
                                1 qt. in each oil radiator ($^+$226.0)


MAXIMUM OPERATING               25000 ft
ALTITUDE


OPERATION TEMPERATURE           ISA +28°C and $^-$40°C
LIMITS


SERIAL N°S ELEGIBLE             110165 and up


DATA PERTINENT TO ALL MODELS


DATUM                           269.68"  forward  of  the  28% wing
                                chords line (frame 16)
                                This line defined as 28% wing chords line
                                is 37.13" forward of  the  rear  jacking
                                points.

| | |
|---|---|
| **LEVELING MEANS** | Plumb from the support in the upper internal part of frame 16 using as reference a mark on the floor. |

**CONTROL SURFACE MOVEMENTS**

Elevator: 22° $\pm$ 1° up
20° $\pm$ 1° down
Rudder  : 25° $\pm$ 1° for each side
Aileron : 22° $\pm$ 1° up
          14° $\pm$ 1° down
Flap    : 38° $\pm$ 1°
Elevator tab:
- left 32° $\pm$ 2° up and down
- right fixed
Aileron tab (left):
- manual    18° $\pm$3° up and down
- automatic 16° $\pm$ 2° up
            8° $\pm$ 2° down
Rudder tab:
- manual: right 12° $\pm$ 2° up
          left  11° $\pm$ 2° down
- automatic:
  . ruder right 25° - rudder tab
    12° $\pm$ 1° left
  . ruder left  25° - rudder tab
    4.5° $\pm$ 1° left

**CERTIFICATION BASIS**

Type Certificate  n°7202  issued December 20, 1972.  The EMB-110P2, EMB-110K1 and EMB-110P1 were certificated showing compliance with: FAR Part 23 effective February 1, 1965 as amended by 23-1 through 23-7 effective September 1969, plus 23.1529 amendment 23-8 effective February 5, 1970.
23.1351(c)(4) amendment 23-14 effective December 20, 1973, and 23.1441 through 23.1449 amendment 23-9 effective June 17, 1970.
Has an equivalent level of safety for paragraph 23.1545 (a).
The model EMB-110P2 and EMB-110P1 in the passenger configuration comply with the special conditions established in the letter n° 341-IFI/77, dated March 21, 1977, with paragraph 25.853 amendment 25-32 effective May 1, 1972, with SFAR 27

amendment 27-1 effective January 1, 1975, with FAR-36 amendment 36-6 effective January 24, 1977, with Appendix A of FAR-135 effective June 19, 1970, and also comply with SFAR-41A effective April 14, 1980 (See Note 11).

The model EMB-110k1 and EMB-110P1 in the cargo configuration comply with the special conditions established in the letter n° 1982-IFI/76 dated December 22, 1976, with SFAR-27 amendment 27-1 effective January 1, 1975, with Paragraphs 25.853, 25.855, 25.857(a) or (e) and 25.787 amendment 25.32 effective May 1, 1972, with paragraph 25.1439 effective December 24, 1964 and with FAR-36 amendment 36-6 effective January 24, 1977.

**PRODUCTION BASIS**        CHE N° E-7203-01.

**SERVICE INFORMATION**     All Embraer Service Bulletins will be CTA approved and will carry a statement to that effect.

**EQUIPMENT**               The basic required equipment as prescribed in the applicable airworthiness regulations (see Certification Basis) must be installed in the aircraft for Certification.  In addition the aircraft must be equipped with the Pilot's Operating Handbook MO-110P2/275 (CTA approved for brazilian registered aircrfat).

The "Basic Equipment Check List" "Chart A", lists all the required and optional equipments and is included in the approved Pilot's Operating Handbook.

For EMB-110P1 in Cargo Version, see Note 12 for required equipment.

## NOTE 1

a) A weight and balance report listing all equipment included in the
   empty weight must be delivered with each airplane.  The approved
   Pilot's Operating Handbook contains detailed loading instructions.
   The certificated empty weight and corresponding center of gravity
   location must include system (undrainable) oil (not included in oil
   capacity) and unusable fuel (not included in usable fuel) as
   follows:
   Fuel: 49  lb at $^+$ 285.8 in
   Oil : 1.1 lb at $^+$ 226.4 in

b) Not applicable.

c) The S/N 110146 model EMB-110P2 is limited to maximum takeoff weight
   of 12346 lb and to maximum landing weight of 11684 lb.

d) Baggage compartment may be modified per EMBRAER drawing n° 110P1-
   856-10.   In this case the maximum capacity will be 705 lb (EMB-
   110P2 only).

e) Baggage compartment may be modified per EMBRAER drawing n° 110P1-
   863-40-51 and 110P1-856-24.   In this case the maximum capacity
   will be 926 lb (EMB-110P1 only).

## NOTE 2

Markings and Placards:

a) In the baggage compartment:
   - For EMB-110P2 "MAXIMUM BAGGAGE 529 lb" or
                   "MAXIMUM BAGGAGE 705 lb" (See Note 1.d)

   - For EMB-110P1 "MAXIMUM BAGGAGE 705 lb" or
                   "MAXIMUM BAGGAGE 926 lb" (See Note 1.e)

b) Near the fuel filler cap:
   "FUEL JP-1 (QAV-1) - JP-4"
   "ANTI-ICING ADDITIVE PER MIL-I-27686 MUST BE USED AT ALL TIMES.
   REFER TO PILOT'S OPERATING HANDBOOK".
   860 LITERS.

c) Near the oil filler cap:
   "OIL" "8.7 LITERS" "REFER TO PILOT'S OPERATING HANDBOOK".

d) Near the emergency exit in red:
   "EMERGENCY EXIT".

e) In the cockpit, in clear view of the pilot:
1. "THIS AIRPLANE MUST BE OPERATED AS A NORMAL CATEGORY AIRPLANE IN COMPLIANCE WITH THE OPERATING LIMITATIONS STATED IN THE FORM OF PLACARDS, MARKINGS AND MANUALS".

2. Placard that specifies the kind of operation (such as VFR, IFR day or night) and the meteorological conditions (such as icing conditions) to which the operation of the airplane is limited or for which is prohibited, by the equipment installed.

3. Maximum operating speed – $V_{MO}$
- up to 14000 ft = 230 knots
- for each 1000 ft above 14000 ft subtract 5 knots.

4. For airplanes approved in accordance with SFAR-41A (See Note 11):
"This airplane is approved in accordance with SFAR-41A for maximum takeoff weight of 13007 lb and maximum landing weight of 12566 lb".

f) In the instrument panel:

1. Close to the airspeed indicator:
DESIGN MANEUVERING SPEED – 169 knots (See Pilot's Operating Handbook)
MAXIMUM LANDING GEAR OPERATION SPEED – 146 knots

2. NO ACROBATIC MANEUVERS, INCLUDING SPINS, APPROVED.


**NOTE 3**

The service life limits of the main structural parts are listed in the approved "Pilot's Operating Handbook".
The most important are:
- airplane service life – 30000 flight hours, this service life can be extended to 45000 flight hours by accomplishing the Embraer Service Bulletin N° 110-057-0023.
- lower wing to fuselage front fittings P/N's 4A-2111-00-03/04 and 4A-1231-50-04/06 – service life of 17000 flight hours. The service life for P/N's 110-2211-00-78, 110-2111-00-78, 110-1231-50-41 and 110-1231-50-42 is 30000 flight hours.
- engine mount – 20000 flight hours.
- life limit for the main landing gear piston tube P/N 14333-000-01 or -02 is: 20000 landings.
- upper part of drag strut P/N 14284-A and 14334-A: 18750 landings

- upper and lower pressure accumulator nut (main hydraulic system and brake accumulators) P/N-6135 and P/N-6359A - service life of 20000 landings.


**NOTE 4**

Not applicable.


**NOTE 5**

If fuel per specifications PWA522 or CPW46 is not available it is possible to use aviation gasoline MIL-G-7752 of all grades for a total time period not exceeding 150 hours during any overhaul period.


**NOTE 6**

a) Not applicable

b) For the models EMB-110K1 and EMB-110P1 when operating in cargo version with the cargo compartment in the classification A (as defined in the Pilot's Operating Handbook), two Pilots are required.

c) The models EMB-110P2, 110k1 and 110P1 may be operated in IFR conditions with one pilot if, in addition to the minimum equipment required by the applicable operational rules, the following equipment is installed in the aircraft:
   - boom microphone
   - apprved automatic pilot, operational and with an coupled approach mode. (See Pilot's Operating Handbook to identify the approved models).


**NOTE 7**

Military aircraft (C-95A) may be converted to model EMB-110K1 aircraft for civilian cargo transportation, when all the modifications required to establish conformity with the approved type design are incorporated.
In addition, for operations with the maximum take-off weight of 5670 kgf and maximum landing weight of 5450 kgf, the modifications defined by EMBRAER Engineering Orders EMB-110P1-0088, 0094, 0084, 0083, EMB-110K1-0395, EMB-110P2-0055 and 0582 must also be incorporated.

**NOTE 8**

The modifications required by the Civil Aviation Authority (CAA) for aircraft to be exported to UK, as defined by EMBRAER drawing 110P2-9001, have been also approved by the CTA, for Brazilian models EMB-110P2, 110K1 and 110P1, with the following exceptions:

a) The flame arrestor of the fuel tanks main vent line must not be removed.

b) The front right emergency exit for the models EMB-110P2, 110P1 and 110K1 is required and must be operational.

**NOTE 9**

The model EMB-110K1 may be equipped with a removable front right emergemcy exit and with provisions for crew evacuation by means of a rope installed in accordance with EMBRAER drawing n° 4A-1240 and 110K1-850-11-02.

**NOTE 10**

Not applicable.

**NOTE 11**

The aircraft factory modified in accordance with EMBRAER drawing n° 110P1-9000 revision K or airplane modified per SE 110-00-003, comply with the SFAR 41 up to amendment A effective in April 14, 1980.   For those aircraft are applicable the following modification in respect to the paragraphs VIII, IX and X of this TCDS:

**CG Range (Landing gear extended)**
- Forward CG limit:
  6548 mm (12,5%) at 5900 kgf
  6526 mm (11,4%) at 5700 kgf (for landing)
  6491 mm ( 9,6%) at 5700 kgf (for takeoff)
  6476 mm ( 8,8%) at 5450 kgf
  6382 mm ( 4,0%) at 4000 kgf or less

- **Rear CG limit**
  6909 min (31%) at 5900 kgf or less.

- **Maximum weight:**
  Take-off      13007 lb
  Landing       12566 lb
  Zero fuel     12015 lb
  Ramp          13073 lb
  (See Note 1.a)

In addition, the Airworthiness Certificate of these aircraft must
incorporate the following statement:
"Aircraft certified under the SFAR 41A, it does not comply integrally
 with the ICAO Annex 8 rules for weights above 5670 kgf".


**NOTE 12**

For cargo version operation model EMB-110P1 must be equipped with:
- Cargo Net for 9g (EMBRAER drawing 110P1-9878-10-01)
- Anti-smoke curtain (EMBRAER drawing 110P1-9878-10-15)
- Smoke detection system (EMBRAER drawing 110-9788-10-01)
- Protective    breathing    system    and    full    face    oxygen    masks
  (EMBRAER drawing 110P1-710-10).
- Retention cargo net or straps to restrain cargo up to 3g loads.


**NOTE 13**

Airplanes model EMB-110P1 and F2 may increase the maximum landing
weight to 5670 kgf if modified per EMBRAER SB 110-32-047.   The new CG
ranges are:
(Landing gear extended)

- **Forward CG Limits:**
  6520 mm (11,1%) at 5670 kgf (for landing)
  6489 mm ( 9,5%) at 5670 kgf (for takeoff)
  6476 mm ( 8,8%) at 5450 kgf
  6382 mm ( 4,0%) at 4000 kgf or less

- **Rear CG limit**
  6909 min (31%) at 5670 kgf or less.
  Straight line variation between points given

---

**NOTE 14**

A new stabilizer with 10° dihedral may be installed in  accordance with EMBRAER SB NR 110-055-0022.
S. N. 110439 and up have this modification factory  incorporated.


Original in Portuguese signed by:




PAULO GASTÃO SILVA - Maj Av                    Maj Brig do Ar - ADYR DA SILVA
Chefe da Divisão de Homologação Aeronáutica              Diretor do CTA




DOC A31

---

**Exhibit "3"**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ESTHER YONG, individually and as personal representative of the estate of PETER CHOON MIN YONG, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A., a foreign corporation for profit, et al., | ) ) ) |
| Defendants. | ) |
| ------------------------------------------------------- | X |

Civil Action No.

**DEFENDANT EMBRAER
AIRCRAFT CORPORATION'S
CONSENT AND JOINDER IN
REMOVAL**

**Defendant EMBRAER AIRCRAFT CORPORATION, by its attorneys Law Offices of John R.W. Parsons and Condon & Forsyth, hereby consents to and joins in the Notice of Removal pursuant to 28 U.S.C. §§ 1330 & 1441(d) filed by defendant EMBRAER-EMPRESA BRASILEIRA DE AERONAUTICA, S.A.**

**Dated:  Miami, Florida
        April 2, 2003**

**LAW OFFICES OF JOHN R.W. PARSONS, P.A.**

By _____
        **John R.W. Parsons, Esq.
        Florida Bar No. 239674**

Ingraham Building
25 S.E. Second Avenue
Miami, Florida   33131-1691
Tel: (305) 374-3104
Fax: (305) 377-9805

- and -

**CONDON & FORSYTH**
Stephen R. Stegich, Esq.
685 Third Avenue
New York, New York  10017
Tel: (212) 490-9100
Fax: (212) 370-4487
Attorneys for Defendant
EMBRAER AIRCRAFT CORPORATION

2

Exhibit B

'

**EXHIBIT "B"**

01- 3145

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION    CIV-JORDAN

MAGISTRATE JUDGE
BANDSTRA

ESTHER YONG, individually and as personal ) No.
representative of the estate of PETER )
CHOON MIN YONG; JONATHAN ) COMPLAINT FOR SURVIVORSHIP
CHUANG HAO YONG; individually; ) AND WRONGFUL DEATH
SAMUEL CHUANG LOONG YONG, a )
minor, by and through his Guardian ad Litem, )
ESTHER YONG, all surviving heirs of PETER )
CHOON MIN YONG, deceased, )
)
)
Plaintiffs, )
)
-vs- )
)
EMBRAER - EMPRESA BRASILEIRA DE )
AERONAUTICA S.A., a foreign corporation )
for profit; EMBRAER AIRCRAFT )
CORPORATION, a Florida subsidiary of )
EMBRAER - EMPRESA BRASILEIRA DE )        NIGHT BOX
AERONAUTICA S.A., )                        FILED
)
Defendants. )                           JUL 1 8 2001
)
_____ )
                                            CLARENCE MADDOX
                                            CLERK, USDC/SDFL/MIA

COME NOW Plaintiffs ESTHER YONG, individually and as personal representative of

the estate of PETER CHOON MIN YONG; JONATHAN CHUANG HAO YONG; individually;

SAMUEL CHUANG LOONG YONG, a minor, by and through his Guardian ad Litem, ESTHER

YONG, all surviving heirs and successors in interest of PETER CHOON MIN YONG, deceased,

and for their cause of action against the defendants state as follows:

### Jurisdiction and General Allegations

1.    At all times mentioned herein, each of the defendants herein was acting in some form or

1

capacity as agent, servant, employee, or in a joint venture, or otherwise, so as to make each responsible for the acts and omissions of the other based upon the principles of vicarious liability.

2.    Plaintiffs' decedent, PETER CHOON MIN YONG, is survived by his wife, ESTHER YONG, and two sons, JONATHAN CHUANG HAO YONG; and SAMUEL CHUANG LOONG YONG, a minor, who sues through his Guardian ad Litem, ESTHER YONG. Esther Yong is the personal representative of the decedent's estate. At all relevant times, all plaintiffs and the decedent have been citizens and residents of Australia.

3.    Defendant EMBRAER AIRCRAFT CORPORATION is a Florida Corporation, maintaining its principal place of business in the State of Florida. Said defendant is a wholly-owned subsidiary of defendant EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., a Brazilian Company, subject to ownership and control by the government of Brazil and thus a foreign state within the meaning of the Foreign Sovereign Immunities Act..

4.    The jurisdiction of this Court over the subject matter of this action is predicated on the Foreign Sovereign Immunities Act, 28 U.S.C.A. Section 1330(a).

5.    Venue is proper in that defendant EMBRAER AIRCRAFT CORPORATION resides in this District. 28 U.S.C.§§ 1391 (a)(3) and 1391 (b)(3).

6.    At all relevant times, defendant EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A. conducted regular and systematic commercial activities in the United States, and , in particular, in the State of Florida.

7.    On or about July 24, 1999 plaintiff's decedent was a fare-paying passenger aboard an Embraer Bandeirante aircraft, registered DQ-AFN, and operated as Air Fiji Flight 121 ("the subject aircraft").

2

At or about 5:40 a.m. Fijian Standard Time, soon after departing from Nausori International Airport, said aircraft encountered severe control and aeronautical problems that caused it to depart unexpectedly and uncontrollably from its flight path and then to crash at low altitude into the mountainous terrain, killing all seventeen people aboard, including plaintiffs' decedent.

## COUNT I

## DANGEROUS AND DEFECTIVE DESIGN AND MANUFACTURE OF A PRODUCT

8.    Plaintiffs incorporate herein by this reference and reallege as though fully set forth paragraphs 1 through 7 above.

9.    Defendants EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., and EMBRAER AIRCRAFT CORPORATION, and each of them were in the business of designing, manufacturing, marketing, testing, inspecting and supplying to the general aviation market the subject Embraer Bandeirante aircraft in question herein as well as certain component parts and systems thereof. Said defendants and each of them further were in the business of placing the subject aircraft and/or component parts and systems into the stream of commerce. The subject aircraft and/or component parts and systems were dangerous and defective in design and manufacture and not fit for their intended purposes as defined in its Type Certificate, Type Certificate Data Sheet, and flight manual, and were further dangerous and defective in that, among other things, the subject aircraft lacked a ground proximity warning mechanism.

10.   Said defects legally and proximately caused and contributed to the crash of Air Fiji Flight 121, as set forth herein.

## COUNT II

3

LAW OFFICES, PODHURST ORSECK JOSEFSBERG EATON MEADOW OLIN & PERWIN, P.A. - OF COUNSEL, WALTER H. BECKHAM, JR.
25 WEST FLAGLER STREET - SUITE 800, MIAMI, FLORIDA 33130-1780
(305) 358-2800

## FAILURE TO WARN

11. Plaintiffs incorporate herein by this reference and reallege as though fully set forth paragraphs 1 through 8 above.

12. Defendants EMBRAER - EMPRESA BRASILEIRA DE AERONAUTICA S.A., and EMBRAER AIRCRAFT CORPORATION, and each of them, failed to provide or supply adequate advice, briefing, instructions or warnings as to the defects in design and manufacture as alleged herein. Further, although agents and employees of based in defendants' Florida maintenance facility traveled annually to Fiji to perform inspections and maintenance of Air Fiji's Embraer aircraft, including the subject aircraft herein, defendants and each of them failed to advise, brief, warn or instruct owners, users or operators, including, as in this case, Air Fiji, of said defectively-designed and -manufactured airframe and/or component parts and systems as to the proper maintenance, care, inspection and repair thereof.

13. Said failure to advise, instruct, brief or warn proximately and legally caused and contributed to the crash of Air Fiji Flight 121, as set forth herein.

## COUNT III

## NEGLIGENCE

14. Plaintiffs incorporate herein by this inference and reallege as though fully set forth paragraphs 1 through 13 above.

15. Defendants and each of them were negligent in and about the design and manufacture of the subject aircraft and/or its component parts and systems. Said defendants and each of them were further negligent in and about advising, warning, briefing or instructing owners, users or operators of the subject aircraft and/or its component parts and systems as to said defective design and manufacture.

4

Said defendants were further negligent in and about advising, briefing, instructing or warning owners, users or operators, including Air Fiji, of said aircraft and/or its component parts and systems as to proper care, maintenance, repair and inspection thereof. Said defendants were further negligent in ways not yet known to plaintiffs, who reserve the right to amend this complaint accordingly upon ascertaining said further negligence.

16. Said negligence proximately and legally caused and contributed to the crash of Alaska Airlines Flight 261, as set forth herein.

17. As a proximate and legal result of this accident and deaths of plaintiffs' decedent herein, plaintiffs and the estate suffered economic and losses, and plaintiffs additionally suffered non-economic losses in that they were deprived of the care, comfort, solace, support, love, and companionship of decedent, all to their general and special damage.

WHEREFORE, plaintiffs prays judgment against defendants and each of them, jointly and severally as follows:

1. For general damages for wrongful death for the
   heirs and beneficiaries;

2. For survival damages as allowed by law on behalf of
   the successor in interest and/or estate;

3. For attorneys' fees as may be allowed by law;

4. For costs of suit;

5

5. For such other and further relief as the court may deem proper.

Respectfully submitted,

PODHURST, ORSECK, JOSEFSBERG,
EATON, MEADOW, OLIN & PERWIN,
P.A.
25 West Flagler Street, Suite 800
Miami, Florida 33130
(305) 358-2800 / Fax (305) 358-2382
info@podhurst.com

By: _____
AARON S. PODHURST
Fla. Bar No. 063606

By: _____
STEVEN C. MARKS
Fla. Bar No. 516414

STERNS & WALKER

Date: July 18, 2001       By: _____
GERALD C. STERNS (CSB #029976)

901 Clay Street
Oakland, CA 94607
Telephone: (510) 267-0500
Facsimile: (510) 267-0506
E-mail: sterns@trial-law.com

Attorneys for Plaintiffs

6