IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

VIKA VAKA, individually and as personal )
representative of the estate of TEVITA HOLANI )    Case No. 01-CV-3144-
MAKA, deceased, et al., )    KING/O'SULLIVAN
)
                           Plaintiffs )    Case No. 03-CV-60627-
)    KING/O'SULLIVAN
)
            vs. )
)
EMBRAER-EMPRESA BRASILEIRA DE )
AERONAUTICA, S.A., a foreign corporation for )
profit, et al. )
                           Defendants. )
-------------------------------------------------------- x
ESTHER YONG, individually and as personal )
representative of the estate of PETER CHOON )    Case No. 01-CV-3145-
MIN YONG, et al., )    KING/O'SULLIVAN
)
                           Plaintiffs )    Case No. 03-CV-60626-
)    KING/O'SULLIVAN
)
            vs. )
)
EMBRAER-EMPRESA BRASILEIRA DE )
AERONAUTICA, S.A., a foreign corporation for )
profit, et al. )
                           Defendants. )
-------------------------------------------------------- x

KIM ELIZABETH ANDERSEN, individually )    Case No. 01-CV-3146-
and as personal representative of the estate )    KING/O'SULLIVAN
of RAY DOUGLAS LLOYD, deceased, et )
al., )    Case No. 03-CV-60557-
)    KING/O'SULLIVAN
)
                           Plaintiffs )
)
            vs. )
)
EMBRAER-EMPRESA BRASILEIRA DE )
AERONAUTICA, S.A., a foreign corporation for )
profit, et al. )
                           Defendants. )
-------------------------------------------------------- x

KATHERINE MARY KOHLENBERG,           )     Case No. 01-CV-3148-
individually and as personal representative   )     KING/O'SULLIVAN
of the estate of CHRISTOPHER            )
FREDERICK KOHLENBERG, deceased,     )     Case No. 03-CV-60625-
et al.,                                           )     KING/O'SULLIVAN
                                                    )
                            Plaintiffs             )
                                                    )
                                                    )
             vs.                                   )
                                                    )
EMBRAER-EMPRESA BRASILEIRA DE       )
AERONAUTICA, S.A., a foreign corporation for  )
profit, et al.                                   )
                            Defendants.           )
---------------------------------------------------------  x

## NOTICE OF RECENT DECISION OF UNITED STATES SUPREME COURT RELEVANT TO DEFENDANT EMBRAER'S NOTICES OF REMOVAL AND MOTIONS TO DISMISS

DEFENDANT   EMBRAER-EMPRESA   BRASILEIRA   DE AERONAUTICA, S.A. ("EMBRAER") hereby provides notice to the Court in the above cases that it intends to withdraw its Motions to Dismiss based on the decision of the United States Supreme Court in Dole Food Co. v. Patrickson, Slip Opinion (April 22, 2003), which holds that the time for determining a defendant's status as a "foreign state" under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332(a)(2-4), 1391(f), 1441(d) & 1602-11, is the time an action is commenced.  A copy of the decision is attached hereto as Exhibit "A."  Defendant EMBRAER was not a "foreign state" when the above actions were commenced in July 2001, and accordingly EMBRAER withdraws these motions.

Defendant EMBRAER removed four of the above actions from the Circuit Court in and for the 17th Judicial Circuit of Broward County, Florida pursuant to its

status as a "foreign state" under the FSIA according to authorities that have been overruled by Dole Food Co. v. Patrickson. Plaintiffs and defendants are conferring on the jurisdictional posture of these cases in the wake of Dole Food Co. v. Patrickson, and will inform the Court of their position on jurisdiction no later than May 7, 2003, the due date for the Local Rule 16.1 Scheduling Report.

Dated:          Miami, Florida
                April 25, 2003

                          Respectfully submitted,

                          LAW OFFICES OF JOHN R. PARSONS, P.A.

                          By: _____
                            John R.W. Parsons, Esq.
                          Florida Bar No. 239674
                          Ingraham Building
                          25 S.E. Second Avenue, Suite 609
                          Miami, Florida   33131-1691
                          Tel: (305) 374-3104
                          Fax: (305) 377-9805

                             - and –

                          CONDON & FORSYTH
                          Stephen R. Stegich, Esq.
                          685 Third Avenue
                          New York, New York  10017
                          Tel: (212) 490-9100
                          Fax: (212) 370-4487

                          Attorneys for Defendants
                          EMBRAER-EMPRESA BRASILEIRA   DE
                          AERONAUTICA, S.A. and EMBRAER
                          AIRCRAFT CORPORATION

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 25th

day of April, 2003, to:

Steven C. Marks, Esq.
Podhurst, Orseck, et al
City National Bank Building, 8th Floor
25 West Flagler Street
Miami, Florida 33130
Tel: (305) 358-2800
Fax:(305) 358-2382

Gerald C. Sterns, Esq.
Sterns & Walker
901 Clay Street
Oakland, CA 94607
Tel: (510) 267-0500
Fax:(510) 267-0506

LAW OFFICES OF JOHN R. W. PARSONS, P.A.

By: _____
JOHN R. W. PARSONS

EXHIBIT "A"

(Slip Opinion)  OCTOBER TERM, 2002  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DOLE FOOD CO. ET AL. *v.* PATRICKSON ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 01–593.  Argued January 22, 2003—Decided April 22, 2003*

Plaintiffs filed a state-court action against Dole Food Company and others (Dole petitioners), alleging injury from chemical exposure. The Dole petitioners impleaded petitioners Dead Sea Bromine Co. and Bromine Compounds, Ltd. (collectively, the Dead Sea Companies). The Dole petitioners removed the action to federal court under 28 U. S. C. §1441(a), arguing that the federal common law of foreign relations provided federal-question jurisdiction under §1331. The District Court agreed it had jurisdiction, but dismissed the case on other grounds. As to the Dead Sea Companies, the court rejected their claim that they are instrumentalities of a foreign state (Israel) as defined by the Foreign Sovereign Immunities Act of 1976 (FSIA), and are therefore entitled to removal under §1441(d). The Ninth Circuit reversed. As to the Dole petitioners, it held removal could not rest on the federal common law of foreign relations. Regarding the Dead Sea Companies, the court noted, but declined to answer, the question whether status as an instrumentality of a foreign state is assessed at the time of the alleged wrongdoing or at the time suit is filed. It held that the Dead Sea Companies, even at the earlier date, were not instrumentalities of Israel because they did not meet the FSIA's instrumentality definition.

*Held:*

   1. The writ of certiorari is dismissed in No. 01–593, as the Dole petitioners did not seek review in this Court of the Ninth Circuit's ruling on the federal common law of foreign relations. P. 3.

———————

   * Together with No. 01–594, *Dead Sea Bromine Co., Ltd., et al.* v. *Patrickson et al.*, also on certiorari to the same court.

Syllabus

2. A foreign state must itself own a majority of a corporation's shares if the corporation is to be deemed an instrumentality of the state under the FSIA. Israel did not have direct ownership of shares in either of the Dead Sea Companies at any time pertinent to this action. Rather, they were, at various times, separated from Israel by one or more intermediate corporate tiers. As indirect subsidiaries of Israel, the companies cannot come within the statutory language granting instrumentality status to an entity a "majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." §1603(b)(2). Only direct ownership satisfies the statutory requirement. In issues of corporate law structure often matters. The statutory reference to ownership of "shares" shows that Congress intended coverage to turn on formal corporate ownership. As a corporation and its shareholders are distinct entities, see, *e.g.*, *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 625, a corporate parent which owns a subsidiary's shares does not, for that reason alone, own or have legal title to the subsidiary's assets; and, it follows with even greater force, the parent does not own or have legal title to the subsidiary's subsidiaries. The veil separating corporations and their shareholders may be pierced in certain exceptional circumstances, but the Dead Sea Companies refer to no authority for extending the doctrine so far that, as a categorical matter, all subsidiaries are deemed to be the same as the parent corporation. Various federal statutes refer to "direct or indirect ownership." The absence of this language in §1603(b) instructs the Court that Congress did not intend to disregard structural ownership rules here. That section's "other ownership interest" phrase, when following the word "shares," should be interpreted to refer to a type of interest other than stock ownership. Reading the phrase to refer to a state's interest in entities further down the corporate ladder would make the specific reference to "shares" redundant. The fact that Israel exercised considerable control over the companies may not be substituted for an ownership interest, since control and ownership are distinct concepts, and it is majority ownership by a foreign state, not control, that is the benchmark of instrumentality status. Pp. 4–8.

3. Instrumentality status is determined at the time of the filing of the complaint. Construing §1603(b)(2) so that the present tense in the provision "a majority of whose shares . . . is owned by a foreign state" has real significance is consistent with the longstanding principle that the Court's jurisdiction depends upon the state of things at the time the action is brought. *E.g.*, *Keene Corp.* v. *United States*, 508 U. S. 200, 207. The Dead Sea Companies' attempt to compare foreign sovereign immunity with other immunities that are based on a government officer's status at the time of the conduct giving rise to

Cite as: 538 U. S. ____ (2003)     3

Syllabus

the suit is inapt because the reason for those other immunities does not apply here. Unlike those immunities, foreign sovereign immunity is not meant to avoid chilling foreign states or their instrumentalities in the conduct of their business but to give them some protection from the inconvenience of suit as a gesture of comity, *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 486. Because any relationship recognized under the FSIA between the Dead Sea Companies and Israel had been severed before suit was commenced, the companies would not be entitled to instrumentality status even if their theory that such status could be conferred on a subsidiary were accepted. Pp. 9–11.

No. 01–593, certiorari dismissed; No. 01–594, affirmed. Reported below: 251 F. 3d 795.

KENNEDY, J., delivered the opinion for a unanimous Court with respect to Parts I, II–A, and II–C, and the opinion of the Court with respect to Part II–B, in which REHNQUIST, C. J., and STEVENS, SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined.

Cite as: 538 U. S. ____ (2003)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 01–593 and 01–594

DOLE FOOD COMPANY, ET AL., PETITIONERS
01–593                        *v.*
GERARDO DENNIS PATRICKSON ET AL.

DEAD SEA BROMINE CO., LTD., AND BROMINE
COMPOUNDS LIMITED, PETITIONERS
01–594                        *v.*
GERARDO DENNIS PATRICKSON ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 22, 2003]

JUSTICE KENNEDY delivered the opinion of the Court.

Foreign states may invoke certain rights and immunities in litigation under the Foreign Sovereign Immunities Act of 1976 (FSIA or Act), Pub. L. 94–583, 90 Stat. 2891. Some of the Act's provisions also may be invoked by a corporate entity that is an "instrumentality" of a foreign state as defined by the Act. *Republic of Argentina* v. *Weltover, Inc.*, 504 U. S. 607, 611 (1992); *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 488 (1983). The corporate entities in this action claim instrumentality status to invoke the Act's provisions allowing removal of state-court actions to federal court. As the action comes to us, it presents two questions. The first is whether a corporate subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but

does own a majority of the shares of a corporate parent one or more tiers above the subsidiary. The second question is whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time suit is filed. We granted certiorari, 536 U. S. 956 (2002).

## I

The underlying action was filed in a state court in Hawaii in 1997 against Dole Food Company and other companies (Dole petitioners). Plaintiffs in the action were a group of farm workers from Costa Rica, Ecuador, Guatemala, and Panama who alleged injury from exposure to dibromochloropropane, a chemical used as an agricultural pesticide in their home countries. The Dole petitioners impleaded petitioners Dead Sea Bromine Co., Ltd., and Bromine Compounds, Ltd. (collectively, the Dead Sea Companies). The merits of the suit are not before us.

The Dole petitioners removed the action to the United States District Court for the District of Hawaii under 28 U. S. C. §1441(a), arguing that the federal common law of foreign relations provided federal-question jurisdiction under §1331. The District Court agreed there was federal subject-matter jurisdiction under the federal common law of foreign relations but, nevertheless, dismissed the case on grounds of *forum non conveniens.*

The Dead Sea Companies removed under a separate theory. They claimed to be instrumentalities of a foreign state as defined by the FSIA, entitling them to removal under §1441(d). The District Court held that the Dead Sea Companies are not instrumentalities of a foreign state for purposes of the FSIA and are not entitled to removal on that basis. Civ. No. 97–01516HG (D. Haw., Sept. 9, 1998), App. to Pet. for Cert. in No. 01–594, p. 79a.

The Court of Appeals reversed. Addressing the ground relied on by the Dole petitioners, it held removal could not

Opinion of the Court

rest on the federal common law of foreign relations. 251 F. 3d 795, 800 (CA9 2001). In this Court the Dole petitioners did not seek review of that portion of the Court of Appeals' ruling, and we do not address it. Accordingly, the writ of certiorari in No. 01–593 is dismissed.

The Court of Appeals also reversed the order allowing removal at the instance of the Dead Sea Companies, who alleged they were instrumentalities of the State of Israel. The Court of Appeals noted, but declined to answer, the question whether status as an instrumentality of a foreign state is assessed at the time of the alleged wrongdoing or at the time suit is filed. It went on to hold that the Dead Sea Companies, even at the earlier date, were not instrumentalities of Israel because they did not meet the Act's definition of instrumentality.

In order to prevail here, the Dead Sea Companies must show both that instrumentality status is determined as of the time the alleged tort occurred and that they can claim instrumentality status even though they were but subsidiaries of a parent owned by the State of Israel. We address each question in turn. In No. 01–594, the case in which the Dead Sea Companies are petitioners, we now affirm.

## II

### A

Title 28 U. S. C. §1441(d) governs removal of actions against foreign states. It provides that "[a]ny civil action brought in a State court against a foreign state as defined in [28 U. S. C. §1603(a)] may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending." See also 28 U. S. C. §1330 (governing original jurisdiction). Section 1603(a), part of the FSIA, defines "foreign state" to include an "agency or instrumentality of a foreign state." "[A]gency or instrumentality of a foreign state" is defined, in turn, as:

"[A]ny entity—
    "(1) which is a separate legal person, corporate or otherwise, and
    "(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
    "(3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." §1603(b).

## B

The Court of Appeals resolved the question of the FSIA's applicability by holding that a subsidiary of an instrumentality is not itself entitled to instrumentality status. Its holding was correct.

The State of Israel did not have direct ownership of shares in either of the Dead Sea Companies at any time pertinent to this suit. Rather, these companies were, at various times, separated from the State of Israel by one or more intermediate corporate tiers. For example, from 1984–1985, Israel wholly owned a company called Israeli Chemicals, Ltd.; which owned a majority of shares in another company called Dead Sea Works, Ltd.; which owned a majority of shares in Dead Sea Bromine Co., Ltd.; which owned a majority of shares in Bromine Compounds, Ltd.

The Dead Sea Companies, as indirect subsidiaries of the State of Israel, were not instrumentalities of Israel under the FSIA at any time. Those companies cannot come within the statutory language which grants status as an instrumentality of a foreign state to an entity a "majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." §1603(b)(2). We hold that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement.

Opinion of the Court

Section 1603(b)(2) speaks of ownership.  The Dead Sea
Companies urge us to ignore corporate formalities and use
the colloquial sense of that term.  They ask whether, in
common parlance, Israel would be said to own the Dead
Sea Companies.  We reject this analysis.  In issues of
corporate law structure often matters.  It is evident from
the Act's text that Congress was aware of settled princi-
ples of corporate law and legislated within that context.
The language of §1603(b)(2) refers to ownership of
"shares," showing that Congress intended statutory cov-
erage to turn on formal corporate ownership.  Likewise,
§1603(b)(1), another component of the definition of in-
strumentality, refers to a "separate legal person, cor-
porate or otherwise."  In light of these indicia that Con-
gress had corporate formalities in mind, we assess
whether Israel owned shares in the Dead Sea Companies
as a matter of corporate law, irrespective of whether Israel
could be said to have owned the Dead Sea Companies in
everyday parlance.

A basic tenet of American corporate law is that the
corporation and its shareholders are distinct entities.  See,
e.g., First Nat. City Bank v. Banco Para el Comercio Exte-
rior de Cuba, 462 U. S. 611, 625 (1983) ("Separate legal
personality has been described as 'an almost indispensable
aspect of the public corporation'"); Burnet v. Clark, 287
U. S. 410, 415 (1932) ("A corporation and its stockholders
are generally to be treated as separate entities").  An
individual shareholder, by virtue of his ownership of
shares, does not own the corporation's assets and, as a
result, does not own subsidiary corporations in which the
corporation holds an interest.  See 1 Fletcher Cyclopedia of
the Law of Private Corporations §31 (rev. ed. 1999).  A
corporate parent which owns the shares of a subsidiary
does not, for that reason alone, own or have legal title to
the assets of the subsidiary; and, it follows with even
greater force, the parent does not own or have legal title to

the subsidiaries of the subsidiary. See *id.*, §31, at 514
("The properties of two corporations are distinct, though
the same shareholders own or control both. A holding
corporation does not own the subsidiary's property"). The
fact that the shareholder is a foreign state does not change
the analysis. See *First Nat. City Bank, supra*, at 626–627
("[G]overnment instrumentalities established as juridical
entities distinct and independent from their sovereign
should normally be treated as such").

Applying these principles, it follows that Israel did not
own a majority of shares in the Dead Sea Companies. The
State of Israel owned a majority of shares, at various
times, in companies one or more corporate tiers above the
Dead Sea Companies, but at no time did Israel own a
majority of shares in the Dead Sea Companies. Those
companies were subsidiaries of other corporations.

The veil separating corporations and their shareholders
may be pierced in some circumstances, and the Dead Sea
Companies essentially urge us to interpret the FSIA as
piercing the veil in all cases. The doctrine of piercing the
corporate veil, however, is the rare exception, applied in
the case of fraud or certain other exceptional circum-
stances, see, *e.g., Burnet, supra*, at 415; 1 Fletcher, *supra,*
§§41 to 41.20, and usually determined on a case-by-case
basis. The Dead Sea Companies have referred us to no
authority for extending the doctrine so far that, as a cate-
gorical matter, all subsidiaries are deemed to be the same
as the parent corporation. The text of the FSIA gives no
indication that Congress intended us to depart from the
general rules regarding corporate formalities.

Where Congress intends to refer to ownership in other
than the formal sense, it knows how to do so. Various
federal statutes refer to "direct and indirect ownership."
See, *e.g.,* 5 U. S. C. §8477(a)(4)(G)(iii) (referring to an
interest "owned directly or indirectly"); 12 U. S. C.
§84(c)(5) (referring to "any corporation wholly owned

directly or indirectly by the United States"); 15 U. S. C.
§79b(a)(8)(A) (referring to securities "which are directly or
indirectly owned, controlled, or held with power to vote");
§1802(3) ("The term 'newspaper owner' means any person
who owns or controls directly, or indirectly through sepa-
rate or subsidiary corporations, one or more newspaper
publications"). The absence of this language in 28 U. S. C.
§1603(b) instructs us that Congress did not intend to
disregard structural ownership rules.

The FSIA's definition of instrumentality refers to a
foreign state's majority ownership of "shares or other
ownership interest." §1603(b)(2). The Dead Sea Compa-
nies would have us read "other ownership interest" to
include a state's "interest" in its instrumentality's subsidi-
ary. The better reading of the text, in our view, does not
support this argument. The words "other ownership
interest," when following the word "shares," should be
interpreted to refer to a type of interest other than owner-
ship of stock. The statute had to be written for the contin-
gency of ownership forms in other countries, or even in
this country, that depart from conventional corporate
structures. The statutory phrase "other ownership inter-
est" is best understood to accomplish this objective.
Reading the term to refer to a state's interest in entities
lower on the corporate ladder would make the specific
reference to "shares" redundant. Absent a statutory text
or structure that requires us to depart from normal rules
of construction, we should not construe the statute in a
manner that is strained and, at the same time, would
render a statutory term superfluous. See *Mertens* v.
*Hewitt Associates*, 508 U. S. 248, 258 (1993) ("We will not
read the statute to render the modifier superfluous");
*United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 36
(1992) (declining to adopt a construction that would vio-
late the "settled rule that a statute must, if possible, be
construed in such fashion that every word has some opera-

tive effect").

The Dead Sea Companies say that the State of Israel exercised considerable control over the their operations, notwithstanding Israel's indirect relationship to those companies. They appear to think that, in determining instrumentality status under the Act, control may be substituted for an ownership interest. Control and ownership, however, are distinct concepts. See, *e.g., United States* v. *Bestfoods*, 524 U. S. 51, 64–65 (1998) (distinguishing between "operation" and "ownership" of a subsidiary's assets for purposes of Comprehensive Environmental Response, Compensation, and Liability Act of 1980 liability). The terms of §1603(b)(2) are explicit and straightforward. Majority ownership by a foreign state, not control, is the benchmark of instrumentality status. We need not delve into Israeli law or examine the extent of Israel's involvement in the Dead Sea Companies' operations. Even if Israel exerted the control the Dead Sea Companies describe, that would not give Israel a "majority of [the companies'] shares or other ownership interest." The statutory language will not support a control test that mandates inquiry in every case into the past details of a foreign nation's relation to a corporate entity in which it does not own a majority of the shares.

The better rule is the one supported by the statutory text and elementary principles of corporate law. A corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares.

We now turn to the second question before us, which provides an alternative reason for affirming the Court of Appeals. See *Woods* v. *Interstate Realty Co.,* 337 U. S. 535, 537 (1949).

## C

To be entitled to removal under §1441(d), the Dead Sea

Companies must show that they are entities "a majority of whose shares or other ownership interest is owned by a foreign state." §1603(b)(2). We think the plain text of this provision, because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed.

Construing §1603(b) so that the present tense has real significance is consistent with the "longstanding principle that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Keene Corp.* v. *United States*, 508 U. S. 200, 207 (1993) (quoting *Mollan* v. *Torrance*, 9 Wheat. 537, 539 (1824)). It is well settled, for example, that federal-diversity jurisdiction depends on the citizenship of the parties at the time suit is filed. See, *e.g., Anderson* v. *Watt*, 138 U. S. 694, 702–703 (1891) ("And the [jurisdictional] inquiry is determined by the condition of the parties at the commencement of the suit"); see also *Minneapolis & St. Louis R. Co.* v. *Peoria & Pekin Union R. Co.*, 270 U. S. 580, 586 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought"). The Dead Sea Companies do not dispute that the time suit is filed is determinative under §1332(a)(4), which provides for suits between "a foreign state, defined in section 1603(a) . . . , as plaintiff and citizens of a State or of different States." It would be anomalous to read §1441(d)'s words, "foreign state as defined in section 1603(a)," differently.

The Dead Sea Companies urge us to administer the FSIA like other status-based immunities, such as the qualified immunity accorded a state actor, that are based on the status of an officer at the time of the conduct giving rise to the suit. We think its comparison is inapt. Our cases applying those immunities do not involve the interpretation of a statute. See, *e.g., Spalding* v. *Vilas*, 161 U. S. 483, 493–499 (1896) (basing a decision regarding official immunity on common law and considerations of

"convenience and public policy"); *Scheuer* v. *Rhodes*, 416
U. S. 232, 239–242 (1974).

The reason for the official immunities in those cases
does not apply here. The immunities for government
officers prevent the threat of suit from "crippl[ing] the
proper and effective administration of public affairs."
*Spalding, supra,* at 498 (discussing immunity for execu-
tive officers); see also *Pierson* v. *Ray*, 386 U. S. 547, 554
(1967) (judicial immunity serves the public interest in
judges who are "at liberty to exercise their functions with
independence and without fear of consequences" (internal
quotation marks omitted)). Foreign sovereign immunity,
by contrast, is not meant to avoid chilling foreign states or
their instrumentalities in the conduct of their business but
to give foreign states and their instrumentalities some
protection from the inconvenience of suit as a gesture of
comity between the United States and other sovereigns.
*Verlinden,* 461 U. S., at 486.

For the same reason, the Dead Sea Companies' reliance
on *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982), is unavailing.
There, we recognized that the President was immune from
liability for official actions taken during his time in office,
even against a suit filed when he was no longer serving in
that capacity. The immunity served the same function
that the other official immunities serve. See *id.,* at 751
("Because of the singular importance of the President's
duties, diversion of his energies by concern with private
lawsuits would raise unique risks to the effective func-
tioning of government"). As noted above, immunity under
the FSIA does not serve the same purpose.

The immunity recognized in *Nixon* was also based on a
further rationale, one not applicable here: the constitu-
tional separation of powers. See *id.,* at 749 ("We consider
this immunity a functionally mandated incident of the
President's unique office, rooted in the constitutional
tradition of the separation of powers and supported by our

Opinion of the Court

history"). That rationale is not implicated by the statutory immunity Congress created for actions such as the one before us.

Any relationship recognized under the FSIA between the Dead Sea Companies and Israel had been severed before suit was commenced. As a result, the Dead Sea Companies would not be entitled to instrumentality status even if their theory that instrumentality status could be conferred on a subsidiary were accepted.

*    *    *

For these reasons, we hold first that a foreign state must itself own a majority of the shares of a corporation if the corporation is to be deemed an instrumentality of the state under the provisions of the FSIA; and we hold second that instrumentality status is determined at the time of the filing of the complaint.

The judgment of the Court of Appeals in No. 01–594 is affirmed, and the writ of certiorari in No. 01–593 is dismissed.

*It is so ordered.*

Cite as: 538 U. S. ____ (2003)        1

Opinion of BREYER, J.

# SUPREME COURT OF THE UNITED STATES

Nos. 01–593 and 01–594

DOLE FOOD COMPANY, ET AL., PETITIONERS
01–593                    *v.*
GERARDO DENNIS PATRICKSON ET AL.

DEAD SEA BROMINE CO., LTD., AND BROMINE
COMPOUNDS LIMITED, PETITIONERS
01–594                    *v.*
GERARDO DENNIS PATRICKSON ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 22, 2003]

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I join Parts I, II–A, and II–C, and dissent only from Part II–B, of the Court's opinion. Unlike the majority, I believe that the statutory phrase "other ownership interest . . . owned by a foreign state," 28 U. S. C. §1603(b)(2), covers a Foreign Nation's legal interest in a Corporate Subsidiary, where that interest consists of the Foreign Nation's ownership of a Corporate Parent that owns the shares of the Subsidiary.

The Foreign Sovereign Immunities Act of 1976 (FSIA) sets forth legal criteria for determining when a "foreign state," 28 U. S. C. §1603(a), can assert a defense of sovereign immunity. The FSIA also specifies that a "foreign state" defendant may ask a federal court to make the relevant sovereign immunity determination.   §1441(d). And the FSIA allows certain foreign-state commercial

entities *not entitled to sovereign immunity* to have the
merits of a case heard in federal court. §§1330(a), 1441(d),
1605(a)(2).   These last-mentioned entities, entitled to
invoke federal-court jurisdiction, include corporations that
fall within the FSIA's definition of an "agency or instru-
mentality of a foreign state," §§1603(a), (b).

The corporate defendants here, subsidiaries of a foreign
parent corporation, fall within that definition if "a major-
ity of [their] shares or *other ownership interest is owned
by*" a foreign nation. §1603(b)(2) (emphasis added).  The
relevant foreign nation does not *directly* own a majority of
the corporate subsidiaries' shares.   But (simplifying the
facts) it does own a corporate parent, which, in turn, owns
the corporate subsidiaries' shares. See *ante*, at 4.

Does this type of majority-ownership interest count as
an example of what the statute calls an "other ownership
interest"?  The Court says no, holding that the text of the
FSIA requires that "*only direct ownership* of a majority of
shares by the foreign state satisfies the statutory require-
ment." *Ante*, at 4 (emphasis added).  I disagree.

The statute's language, standing alone, cannot answer
the question.  That is because the words "own" and "own-
ership"—neither of which is defined in the FSIA—are not
technical terms or terms of art but common terms, the
precise legal meaning of which depends upon the statutory
context in which they appear. See J. Cribbet & C. Johnson,
Principles of the Law of Property 16 (3d ed. 1989) ("Anglo-
American law has not made much use of the term owner-
ship in a technical sense"); Black's Law Dictionary 1049,
1105 (6th ed. 1990) ("The term ['owner'] is . . . a nomen
generalissimum"—a "term of the most general meaning" or
"of the most general kind"—"and its meaning is to be gath-
ered from the connection in which it is used, and from the
subject-matter to which it is applied"). See also *Williams* v.
*Taylor*, 529 U. S. 420. 431 (2000) ("We give the words of a

statute their *ordinary, contemporary, common meaning*, absent an indication Congress intended them to bear some different import" (internal quotation marks omitted; emphasis added)).

Thus, this Court has held that "ship*owne[r]*" can include a corporate shareholder even though, technically speaking, the corporation, not the shareholder, owns the ship. *Flink* v. *Paladini,* 279 U. S. 59, 62–63 (1929) (emphasis added). Moreover, this Court has held that a trademark can be "*owned by*" a parent corporation even though, technically speaking, a subsidiary corporation, not the parent, registered and thus owned the mark. *K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 292 (1988) (opinion of KENNEDY, J.) (emphasis added) (noting "the inability to discern" which "entit[y] . . . can be said to 'own' the . . . trademark if . . . the domestic subsidiary is wholly owned by its foreign parent"); *id.,* at 318 (SCALIA, J., concurring in part and dissenting in part) ("It may be reasonable for some purposes to say that a trademark nominally owned by a domestic subsidiary is 'owned by' its foreign parent corporation"); *id.,* at 319 ("A parent corporation may or may not be said to 'own' the assets owned by its subsidiary"). Similarly, here the words "other ownership interest" might, or might not, refer to the kind of majority-ownership interest that arises when one owns the shares of a parent that, in turn, owns a subsidiary. If a shareholder in Company A is an "owner" of Company A's ship, as in *Flink,* then why should the shareholder not be an "owner" of Company A's subsidiary? If Company A's trademark can be said to be "owned by" its shareholder, as in *K mart,* then why should Company A's subsidiary not be said to be "owned by" its shareholder? And, at the very least, can we not say that the shareholder has an "ownership interest" in the subsidiary?

Neither do the various linguistic indicia to which the majority points help resolve the question. As the majority points out, the statute's use of the word "shares" leans in

favor of reading "ownership" as incorporating formal,
technical American legal requirements. *Ante,* at 5–6.  But
any resulting suggestion of formal technical limitation is
neatly counterbalanced by the fact that the "statute had to
be written for the contingency of ownership forms in other
countries, or even in this country, that depart from con-
ventional corporate structures." *Ante,* at 7.   And given
this latter necessity, there is no reason to read the phrase
"*shares or other*" as if those words meant to exclude from
the scope of "other" any kind of mixed, say, debt/equity,
ownership arrangement that might involve shares only in
part.

The majority's further claim that Congress's use of the
word "ownership" means "only *direct* ownership," *ante,* at
4 (emphasis added), or formal ownership, founders upon
*Flink, supra,* and *K mart, supra,* as well as upon several
statutes that demonstrate that Congress felt it necessary
explicitly to use the word "direct" (a word missing in the
FSIA) in order to achieve that result.  See, *e.g.,* 20 U. S. C.
§1087–3(a)  ("common  shares . . . *directly  owned*  by  a
Holding   Company"   (emphasis   added));   26   U. S. C.
§165(g)(3)(A) (requiring that "the taxpayer *owns directly*
stock" in a corporation (emphasis added)); §851(c)(3)(A)
(stock "*owned directly* by one or more of the other corpora-
tions" (emphasis added)).   Were the Court's logic correct,
see *ante,* at 7–8, the word "direct" in these statutes would
be redundant.

The majority's "veil piercing" argument, *ante,* at 6, is
beside the point.  So is the majority's reiteration of the
separateness of a corporation and its shareholders, *ante,*
at 5–6, a formal separateness that this statute explicitly
sets aside.  See 28 U. S. C. §§1603(a), (b) (acknowledging
the separateness of a corporate entity but nevertheless
deliberately conferring the "foreign state" status of the
shareholder upon the corporation itself); H. R. Rep. No.
94–1487, p. 15 (1976) (same).  See also Working Group of

Opinion of BREYER, J.

the American Bar Association, Reforming the Foreign
Sovereign Immunities Act, 40 Colum. J. Transnat'l L. 489,
517–518 (2002) (hereinafter ABA Working Group) (FSIA
rejects the "separate-entity" rule that courts had often
applied to deny immunity to state-owned corporations).

Statutory interpretation is not a game of blind man's
bluff. Judges are free to consider statutory language in
light of a statute's basic purposes. And here, as in *Flink,
supra,* and *K mart, supra,* an examination of those pur-
poses sheds considerable light. The statute itself makes
clear that it seeks: (1) to provide a foreign-state defendant
in a legal action the right to have its claim of a sovereign
immunity bar decided by the "courts of the United States,"
*i.e.,* the federal courts, 28 U. S. C. §1604; see §1441(d); and
(2) to make certain that the merits of unbarred claims
against foreign states, say, states engaging in commercial
activities, see §1605(a)(2), will be decided "in the same
manner" as similar claims against "a private individual,"
§1606; but (3) to guarantee a foreign state defending an
unbarred claim certain protections, including a prohibition
of punitive damages, the right to removal to federal court,
a trial before a judge, and other procedural rights (related
to service of process, venue, attachment, and execution of
judgments). §§1330, 1391(f), 1441(d), 1606, 1608–1611.
See *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S.
480, 497 (1983) ("Congress deliberately sought to channel
cases against foreign sovereigns away from the state
courts and into federal courts"); H. R. Rep. No. 94–1487, at
32 ("giv[ing] foreign states clear authority to remove to a
Federal forum actions brought against them in the State
courts" in light of "the potential sensitivity of actions
against foreign states and the importance of developing a
uniform body of law in this area"); *id.,* at 13 ("Such broad
jurisdiction in the Federal courts should be conducive to
uniformity in decision, which is desirable since a disparate

treatment of cases involving foreign governments may have adverse foreign relations consequences").

Most important for present purposes, the statute seeks to guarantee these protections to the foreign nation not only when it acts directly in its own name but also when it acts through separate legal entities, including corporations and other "organ[s]." 28 U. S. C. §1603(b).

Given these purposes, what might lead Congress to grant protection to a Foreign Nation acting through a Corporate Parent but deny the same protection to the Foreign Nation acting through, for example, a wholly owned Corporate Subsidiary? The answer to this question is: In terms of the statute's purposes, *nothing at all* would lead Congress to make such a distinction.

As far as this statute is concerned, decisions about how to incorporate, how to structure corporate entities, or whether to act through a single corporate layer or through several corporate layers are matters purely of form, not of substance. Cf. H. R. Rep. No. 94–1487, at 15 (agencies or instrumentalities "could assume a variety of forms"); *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba,* 462 U. S. 611, 625 (1983) (noting that "developing countries" often "establish separate juridical entities . . . to make large-scale national investments"). The need for federal court determination of a sovereign immunity claim is no less important where subsidiaries are involved. The need for procedural protections is no less compelling. The risk of adverse foreign policy consequences is no less great. See ABA Working Group 523 ("The strength of a foreign state's sovereign interests . . . does not necessarily dissipate when it employs more complicated legal structures resembling those used by modern private businesses"); Dellapenna, Refining the Foreign Sovereign Immunities Act, 9 Willamette J. Int'l L. & Disp. Resol. 57, 92–93 (2001). See also A. Kumar, The State Holding Company: Issues and Options 3 (World Bank Discussion Paper No.

187, 1992) ("The existence of state holding companies, in many variants, is widespread").

That is why I doubt the majority's claim that its reading of the text of the FSIA is "[t]he better reading," *ante*, at 7, leading to "[t]he better rule," *ante*, at 8.  The majority's rule is not better for a foreign nation, say, Mexico or Honduras, which may use "a tiered corporate structure to manage and control important areas of national interest, such as natural resources," ABA Working Group 523, and, as a result, will find its ability to use the federal courts to adjudicate matters of national importance and "potential sensitivity" restricted, H. R. Rep. No. 94–1487, at 32. Congress is most unlikely to characterize as "better" a rule tied to legal formalities that undercuts its basic jurisdictional objectives.  And working lawyers will now have to factor into complex corporate restructuring equations (determining, say, whether to use an intermediate holding company when merging or disaggregating even wholly owned government corporations) a risk that the government might lose its previously available access to federal court.

Given these consequences, from what perspective can the Court's unnecessarily technical reading of this part of the statute produce a "better rule"?  To hold, as the Court does today, that for purposes of the FSIA "other ownership interest" does not include the interest that a Foreign Nation has in a tiered Corporate Subsidiary "would be not merely to depart from the primary rule that words are to be taken in their ordinary sense, but to narrow the operation of the statute to an extent that would seriously imperil the accomplishment of its purpose." *Danciger* v. *Cooley*, 248 U. S. 319, 326 (1919).

I believe that the Court should decide this issue just as it decided *Flink*.  There, the Court unanimously determined that, in light of "[t]he policy of the statutes" in question, a corporate shareholder was an "owner" of a

ship, which, technically speaking, belonged to the corporation. 279 U. S., at 62–63. Justice Holmes wrote, in his opinion for the Court:

> "For th[e] purpose [of these statutes] no rational distinction can be taken between several persons owning shares in a vessel [here, a subsidiary] directly and making the same division by putting the title in a corporation and distributing the corporate stock. The policy of the statutes must extend equally to both. . . . We are of [the] opinion that the words of the acts must be taken in a broad and popular sense in order not to defeat the manifest intent. This is not to ignore the distinction between a corporation and its members, a distinction that cannot be overlooked even in extreme cases . . . , but to interpret an untechnical word ['owner'] in the liberal way in which we believe it to have been used . . . ." *Ibid.*

No more need be said.